## BRANIFF AIRWAYS, INC. *v.* NEBRASKA STATE BOARD OF EQUALIZATION AND ASSESSMENT ET AL.

No. 476.   Argued March 12, 1954.—Decided June 1, 1954.

*William J. Hotz, Sr.* argued the cause for appellant. With him on the brief were *William J. Hotz, Jr.* and *Roger J. Whiteford.*

*C. C. Sheldon,* Assistant Attorney General of Nebraska, argued the cause for appellees. With him on the brief was *Clarence S. Beck,* Attorney General.

MR. JUSTICE REED delivered the opinion of the Court.

The question presented by this appeal from the Supreme Court of Nebraska is whether the Constitution bars the State of Nebraska from levying an apportioned ad valorem tax on the flight equipment of appellant, an interstate air carrier. Appellant is not incorporated in Nebraska and does not have its principal place of business or home port registered under the Civil Aeronautics Act, 52 Stat. 973, 977, 49 U. S. C. §§ 401–705, in that state. Such flight equipment is employed as a part of a system of interstate air commerce operating over fixed routes and landing on and departing from airports within Nebraska on regular schedules. Appellant does not challenge the reasonableness of the apportionment prescribed by the taxing statute or the application of such apportionment to its property. It contends only that its flight equipment used in interstate commerce is immune from taxation by Nebraska because without situs in that state and because regulation of air navigation by the Federal Government precludes such state taxation.

This petition for a declaratory judgment of the invalidity of §§ 77–1244 to 77–1250 of the state tax statute [1]

---

[1] Neb. Rev. Stat., 1943, § 77–1244 *et seq.*

and an injunction against the collection of taxes assessed under such provisions for previous years was filed as an original action in the court below by Mid-Continent Airlines, Inc., and tried upon stipulated facts. Subsequent to filing, but before the decision, Mid-Continent and appellant were merged on August 1, 1952, and appellant was substituted as the party plaintiff. Mid-Continent had been incorporated in Delaware with its corporate place of business in Wilmington in that state, and Braniff is incorporated in Oklahoma and has its corporate place of business in Oklahoma City. Pursuant to the merger Mid-Continent's main executive offices were moved from Kansas City, Missouri, and merged with appellant's in Dallas, Texas. The number of regularly scheduled stops in Nebraska, fourteen per day at Omaha and four at Lincoln, was not affected by the merger.

The home port registered with the Civil Aeronautics Authority and the overhaul base for the aircraft in question is the Minneapolis-St. Paul Airport, Minnesota. All of the aircraft not undergoing overhaul fly regular schedules upon a circuit ranging from Minot, North Dakota, to New Orleans, Louisiana, with stops in fourteen states including Minnesota, Nebraska and Oklahoma. No stops were made in Delaware. The Nebraska stops are of short duration since utilized only for the discharge and loading of passengers, mail, express, and freight, and sometimes for refueling. Appellant neither owns nor maintains facilities for repairing, reconditioning, or storing its flight equipment in Nebraska, but rents depot space and hires other services as required. The Supreme Court of Nebraska made no distinction as to taxability between those years when no flights were made into the state of domicile (Delaware) and those when flights did enter the state of new domicile (Oklahoma).

It is stipulated that the tax in question is assessed only against regularly scheduled air carriers and is not applied

to carriers who operate only intermittently in the state. The statute defines "flight equipment" as "aircraft fully equipped for flight," [2] and provides that "any tax upon or measured by the value of flight equipment of air carriers incorporated or doing business in this state shall be assessed and collected by the Tax Commissioner." [3]   A formula is prescribed for arriving at the proportion of a carrier's flight equipment to be allocated to the state. [4]

The statute uses the allocation formula of the "proposed uniform statute to provide for an equitable method of state taxation of air carriers" adopted by the Council of State Governments upon the recommendation of the National Association of Tax Administrators in 1947. [5] Use of a uniform allocation formula to apportion air-carrier taxes among the states follows the recommendation of the Civil Aeronautics Board in its report to Congress. [6]

[2] *Id.*, § 77–1244 (3).

[3] *Id.*, § 77–1245.

[4] *Ibid.*  This section provides that "The proportion of flight equipment allocated to this state for purposes of taxation shall be the arithmetical average of the following three ratios: (1) The ratio which the aircraft arrivals and departures within this state scheduled by such air carrier during the preceding calendar year bears to the total aircraft arrivals and departures within and without this state scheduled by such carrier during the same period; *Provided,* that in the case of nonscheduled operations all arrivals and departures shall be substituted for scheduled arrivals and departures; (2) the ratio which the revenue tons handled by such air carrier at airports within this state during the preceding calendar year bears to the total revenue tons handled by such carrier at airports within and without this state during the same period; and (3) the ratio which such air carrier's originating revenue within this state for the preceding calendar year bears to the total originating revenue of such carrier within and without this state for the same period."

[5] Resolutions, The Eighth General Assembly of the States, 20 State Government 95.

[6] Multiple Taxation of Air Commerce, H. R. Doc. No. 141, 79th Cong., 1st Sess.  Recommendations by various interested groups as to the proper method of apportionment are included in that report

The Nebraska statute provides for reports, levy, and rate of tax by state average.[7]

Required reports filed by Mid-Continent for 1950 show that about 9% of its revenue and 11½% of the total system tonnage originated in Nebraska and about 9% of its total stops were made in that state. From these figures, using the statutory formula, the Tax Commissioner arrived at a valuation of $118,901 allocable to Nebraska, resulting in a tax of $4,280.44. Since Mid-Continent filed no return for 1951 the same valuation was used and an increased rate resulted in assessment of $4,518.29. The Supreme Court of Nebraska held the statute not violative of the Commerce Clause and dismissed appellant's petition.[8]

Appellant argues that federal statutes governing air commerce enacted under the commerce power pre-empt the field of regulation of such air commerce and preclude this tax. Congress, by the Civil Aeronautics Act of 1938, 52 Stat. 973, 977, 1028, § 1107 (i)(3), 49 U. S. C. § 176 (a), enacted:

> "The United States of America is declared to possess and exercise complete and exclusive national sovereignty in the air space above the United States, including the air space above all inland waters and the air space above those portions of the adjacent

and its appendices. See also Arditto, State and Local Taxation of Scheduled Local Airlines, 16 J. Air L. & Com. 162; Kassell, Interstate Cooperation and Airlines, 25 Taxes 302. Mr. Bulwinkle introduced bills in accordance with the recommendation of the C. A. B. report that the National Government should prescribe the method of state taxation of air carriers. The bills adopted the Council formula utilized by Nebraska. Neither was enacted. H. R. 3446, 79th Cong., 1st Sess.; H. R. 1241, 80th Cong., 1st Sess.

[7] Neb. Rev. Stat., 1943, §§ 77–1247, 77–1249.

[8] *Mid-Continent Airlines, Inc.* v. *Nebraska State Board of Equalization and Assessment*, 157 Neb. 425, 59 N. W. 2d 746.

marginal high seas, bays, and lakes, over which by international law or treaty or convention the United States exercises national jurisdiction."

This provision originated in the Air Commerce Act of 1926, 44 Stat. 568, 572, § 6. The 1938 Act also declares "a public right of freedom of transit" for air commerce in the navigable air space to exist for any citizen of the United States. 52 Stat. 980, § 3, 49 U. S. C. § 403.[9]

The provision pertinent to sovereignty over the navigable air space in the Air Commerce Act of 1926 was an assertion of exclusive national sovereignty. The convention between the United States and other nations respecting international civil aviation ratified August 6, 1946, 61 Stat. 1180, accords. The Act, however, did not expressly exclude the sovereign powers of the states. H. R. Rep. No. 572, 69th Cong., 1st Sess., p. 10. The Civil Aeronautics Act of 1938 gives no support to a different view.[10] After the enactment of the Air Commerce Act, more than twenty states adopted the Uniform Aeronautics Act. It had three provisions indicating that the states did not consider their sovereignty affected by the National Act except to the extent that the states had ceded that sovereignty by constitutional grant.[11] The

---

[9] That space was defined in § 10 of the Air Commerce Act and freedom for its navigation declared. This was continued by the Civil Aeronautics Act, 49 U. S. C. § 180, in "airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority."

[10] S. Rep. No. 1661, 75th Cong., 3d Sess.; H. R. Rep. No. 2254, 75th Cong., 3d Sess.; H. R. Conf. Rep. No. 2635, 75th Cong., 3d Sess.

[11] 11 Uniform Laws Annotated 159, 160:

"§ 2. Sovereignty in Space.—Sovereignty in the space above the lands and waters of this State is declared to rest in the State, except where granted to and assumed by the United States pursuant to a constitutional grant from the people of this State.

"§ 3. Ownership of Space.—The ownership of the space above the lands and waters of this State is declared to be vested in the several

recommendation of the National Conference of Commissioners on Uniform State Laws to the states to enact this Act was withdrawn in 1943.[12] Where adopted, however, it continues in effect. See *United States* v. *Praylou,* 208 F. 2d 291. Recognizing this "exclusive national sovereignty" and right of freedom in air transit, this Court in *United States* v. *Causby,* 328 U. S. 256, 261, nevertheless held that the owner of land might recover for a taking by national use of navigable air space, resulting in destruction in whole or in part of the usefulness of the land property.

These Federal Acts regulating air commerce are bottomed on the commerce power of Congress, not on national ownership of the navigable air space, as distinguished from sovereignty. In reporting the bill which became the Air Commerce Act, it was said:

> "The declaration of what constitutes navigable air space is an exercise of the same source of power, the interstate commerce clause, as that under which Congress has long declared in many acts what constitutes navigable or nonnavigable waters. The public right of flight in the navigable air space owes

owners of the surface beneath, subject to the right of flight described in Section 4.

"§ 4. Lawfulness of Flight.—Flight in aircraft over the lands and waters of this State is lawful, unless at such a low altitude as to interfere with the then existing use to which the land or water, or the space over the land or water, is put by the owner, or unless so conducted as to be imminently dangerous to persons or property lawfully on the land or water beneath. The landing of an aircraft on the lands or waters of another, without his consent, is unlawful, except in the case of a forced landing. For damages caused by a forced landing, however, the owner or lessee of the aircraft or the aeronaut shall be liable, as provided in Section 5."

[12] See Conference Handbook, 1943, pp. 66–67. Efforts continue to draft an acceptable State Uniform Aeronautical Code. See Conference Handbook, 1948, p. 147.

its source to the same constitutional basis which, under decisions of the Supreme Court, has given rise to a public easement of navigation in the navigable waters of the United States, regardless of the ownership of the adjacent or subjacent soil." H. R. Rep. No. 572, 69th Cong., 1st Sess., p. 10.

The commerce power, since *Gibbons* v. *Ogden,* 9 Wheat. 1, 193, has comprehended navigation of streams. Its breadth covers all commercial intercourse. But the federal commerce power over navigable streams does not prevent state action consistent with that power. *Gilman* v. *Philadelphia,* 3 Wall. 713, 729. Since, over streams, Congress acts by virtue of the commerce power, the sovereignty of the state is not impaired. *Oklahoma* v. *Atkinson Co.,* 313 U. S. 508, 534. The title to the beds and the banks are in the states and the riparian owners, subject to the federal power over navigation.[13] Federal regulation of interstate land and water carriers under the commerce power has not been deemed to deny all state power to tax the property of such carriers. We conclude that existent federal air-carrier regulation does not preclude the Nebraska tax challenged here.

Nor has appellant demonstrated that the Commerce Clause otherwise bars this tax as a burden on interstate commerce.[14] We have frequently reiterated that the

---

[13] *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 60; *United States* v. *Kansas City Ins. Co.,* 339 U. S. 799, 808; *Federal Power Comm'n* v. *Niagara Mohawk Power Corp.,* 347 U. S. 239, 246 *et seq.*

[14] In its original petition appellant also alleged that the Nebraska statute is invalid under § 9, cl. 6, and § 10, cl. 3 of Art. I of the Constitution. While noting that such contentions were apparently "abandoned in the brief and oral argument," the court below held such provisions of the Constitution not violated. Since appellant did not preserve such contentions in its Statement as to Jurisdiction, we do not consider such issues.

Commerce Clause does not immunize interstate instrumentalities from all state taxation, but that such commerce may be required to pay a nondiscriminatory share of the tax burden.[15]   And appellant does not allege that this Nebraska statute discriminates against it nor, as noted above, does it challenge the reasonableness of the apportionment prescribed by the statute.[16]

The argument upon which appellant depends ultimately, however, is that its aircraft never "attained a taxable situs within Nebraska" from which it argues that the Nebraska tax imposes a burden on interstate commerce.   In relying upon the Commerce Clause on this issue and in not specifically claiming protection under the Due Process Clause of the Fourteenth Amendment, appellant names the wrong constitutional clause to support its position.   While the question of whether a commodity en route to market is sufficiently settled in a state for purpose of subjection to a property tax has been determined by this Court as a Commerce Clause question,[17]

---

[15] *Western Live Stock* v. *Bureau,* 303 U. S. 250, 254; *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157, 165.

[16] See *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18; *Ford Motor Co.* v. *Beauchamp,* 308 U. S. 331; *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362; *Greyhound Lines* v. *Mealey,* 334 U. S. 653, 654, 662, 663; *Ott* v. *Mississippi Valley Barge Line Co.,* 336 U. S. 169, 174; *Canton R. Co.* v. *Rogan,* 340 U. S. 511, 514–516; Multiple Taxation of Air Commerce, H. R. Doc. No. 141, 79th Cong., 1st Sess.; Arditto, State and Local Taxation of Scheduled Local Airlines, 16 J. Air L. & Com. 162; Howard, State Taxation of Airplanes in Interstate Commerce, 10 Mo. L. Rev. 195; Welch, The Taxation of Air Carriers, 11 Law & Contemp. Prob. 584; Green, The War Against the States in Aviation, 31 Va. L. Rev. 835; Sutherland and Vinciguerra, The Octroi and the Airplane, 32 Cornell L. Q. 161; Saxe, Federal Control of the State Taxation of Airlines, 31 Cornell L. Q. 228; Ternes, Aviation Taxation, 25 Mich. S. B. J. 23; Note, 57 Harv. L. Rev. 1097.

[17] See, *e. g., Independent Warehouses* v. *Scheele,* 331 U. S. 70, 72; *Carson Petroleum Co.* v. *Vial,* 279 U. S. 95; *Champlain Realty*

the bare question whether an instrumentality of commerce has tax situs in a state for the purpose of subjection to a property tax is one of due process.[18]   However, appellant timely raised and preserved its contention that its property was not taxable because such property had attained no taxable situs in Nebraska.   Though inexplicit, we consider the due process issue within the clear intendment of such contention and hold such issue sufficiently presented.   See *New York ex rel. Bryant* v. *Zimmerman*, 278 U. S. 63, 67, and cases cited; Robertson and Kirkham, Jurisdiction of the Supreme Court of the United States (Wolfson and Kurland ed.), 149 *et seq.*

Appellant relies upon cases involving ocean-going vessels to support its contention that its aircraft attained no tax situs in Nebraska.   See, *e. g., Hays* v. *Pacific*

---

*Co.* v. *Brattleboro*, 260 U. S. 366; *General Oil Co.* v. *Crain*, 209 U. S. 211; *Coe* v. *Errol*, 116 U. S. 517; *Brown* v. *Houston*, 114 U. S. 622; Powell, Taxation of Things in Transit, 7 Va. L. Rev. 167, 245, 429, 497.

[18] See, *e. g., Johnson Oil Rfg. Co.* v. *Oklahoma*, 290 U. S. 158; *Frick* v. *Pennsylvania*, 268 U. S. 473; *Union Refrigerator Transit Co.* v. *Kentucky*, 199 U. S. 194; *Delaware, L. & W. R. Co.* v. *Pennsylvania*, 198 U. S. 341; 1 Beale, Conflict of Laws, 533 *et seq.;* Moore, Taxation of Movables and the Fourteenth Amendment, 7 Col. L. Rev. 309; Page, Jurisdiction to Tax Tangible Movables, 1945 Wis. L. Rev. 125.

While the common-law concept of situs was recognized by this Court as a limitation on state power to tax tangible personalty prior to invocation of the Fourteenth Amendment as a defense to such taxation, the bases for such decisions varied and no consistent constitutional principle was applied.   Compare the following cases: *Hays* v. *Pacific Mail S. S. Co.*, 17 How. 596; *Morgan* v. *Parham*, 16 Wall. 471; *St. Louis* v. *The Ferry Co.*, 11 Wall. 423; *Marye* v. *Baltimore & O. R. Co.*, 127 U. S. 117; *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18; *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194. See also Hartman, State Taxation of Interstate Commerce, 13, 73 *et seq.*

A collection of this Court's decisions dealing with power to tax may be found in an Appendix to *Miller Bros. Co.* v. *Maryland*, 347 U. S. 340, notes 8–20.

*Mail S. S. Co.,* 17 How. 596; *Morgan* v. *Parham,* 16 Wall. 471; *Southern Pacific Co.* v. *Kentucky,* 222 U. S. 63. The first two cases were efforts to tax the entire value of the ships as other local property, without apportionment, when they were used to plow the open seas. The last case holds the state of corporate domicile has power to tax vessels that are not taxable elsewhere. A closer analogy exists between planes flying interstate and boats that ply the inland waters. We perceive no logical basis for distinguishing the constitutional power to impose a tax on such aircraft from the power to impose taxes on river boats. *Ott* v. *Mississippi Valley Barge Line Co.,* 336 U. S. 169; *Standard Oil Co.* v. *Peck,* 342 U. S. 382. The limitation imposed by the Due Process Clause upon state power to impose taxes upon such instrumentalities was succinctly stated in the *Ott* case: "So far as due process is concerned the only question is whether the tax in practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing State." 336 U. S., at 174. In *Curry* v. *McCanless,* 307 U. S. 357, the evolution of such restriction on state power was reviewed and the rule stated thusly:

> "When we speak of the jurisdiction to tax land or chattels as being exclusively in the state where they are physically located, we mean no more than that the benefit and protection of laws enabling the owner to enjoy the fruits of his ownership and the power to reach effectively the interests protected, for the purpose of subjecting them to payment of a tax, are so narrowly restricted to the state in whose territory the physical property is located as to set practical limits to taxation by others." *Id.,* at 364.

Thus the situs issue devolves into the question of whether eighteen stops per day by appellant's aircraft is sufficient contact with Nebraska to sustain that state's

power to levy an apportioned ad valorem tax on such aircraft. We think such regular contact is sufficient to establish Nebraska's power to tax even though the same aircraft do not land every day and even though none of the aircraft is continuously within the state. "The basis of the jurisdiction is the habitual employment of the property within the State." [19] Appellant rents its ground facilities and pays for fuel it purchases in Nebraska. This leaves it in the position of other carriers such as rails, boats and motors that pay for the use of local facilities so as to have the opportunity to exploit the commerce, traffic, and trade that originates in or reaches Nebraska. Approximately one-tenth of appellant's revenue is produced by the pickup and discharge of Nebraska freight and passengers. Nebraska certainly affords protection during such stops and these regular landings are clearly a benefit to appellant.

Nor do we think that Nebraska's power to levy this tax was affected by the merger of Mid-Continent with Braniff. Since "the rule which permits taxation by two or more states on an apportionment basis precludes taxation of all of the property by the state of the domicile," *Standard Oil Co.* v. *Peck, supra,* at 384, we deem it immaterial that before the merger Mid-Continent was domiciled in Delaware, a state through which its planes did not fly, and after the merger Braniff is domiciled in Oklahoma, a state through which these aircraft make regular flights.

Appellant urges that *Northwest Airlines* v. *Minnesota,* 322 U. S. 292, precludes this tax unless that case is to be overruled. In that case Minnesota, as the domicile of the air carrier and its "home port," was permitted to tax the entire value of the fleet ad valorem although it ranged

---

[19] *Johnson Oil Rfg. Co.* v. *Oklahoma, supra,* at 162. See also *Pullman's Palace Car Co.* v. *Pennsylvania, supra; Ott* v. *Mississippi Valley Barge Line Co., supra.*

by fixed routes through eight states.[20]   While no one view mustered a majority of this Court, it seems fair to say that without the position stated in the Conclusion and Judgment which announced the decision of this Court, the result would have been the reverse.   That position was that it was not shown "that a defined part of the domiciliary corpus has acquired a permanent location, *i. e.*, a taxing situs, elsewhere." P. 295.   That opinion recognized the "doctrine of tax apportionment for instrumentalities engaged in interstate commerce," p. 297, but held it inapplicable because no "property (or a portion of fungible units) is permanently situated in a State other than the domiciliary State." P. 298.   When *Standard Oil Co.* v. *Peck,* 342 U. S. 382, 384, was here, the Court interpreted the *Northwest Airlines* case to permit states other than those of the corporate domicile to tax boats in interstate commerce on the apportionment basis in accordance with their use in the taxing state.   We adhere to that interpretation.

*Affirmed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE JACKSON dissents for the reasons stated in his concurring opinion in *Northwest Airlines* v. *Minnesota,* 322 U. S. 292, 302.

MR. JUSTICE DOUGLAS, concurring.

Braniff Airways, in challenging the power of Nebraska to lay this ad valorem tax, claims only that its planes have no taxable situs in the State.   It does not claim that no fraction of the aircraft, on an apportioned basis,

---

[20] Subsequent to the *Northwest Airlines* case, Minnesota enacted a tax statute incorporating an apportionment formula for allocation of the valuation of property of air carriers to Minnesota. Minn. Stat., 1945, §§ 270.071–270.079, as amended, Minn. Laws 1953, c. 672, §§ 2–3.

is permanently in the State. Nor does it attack this apportionment formula.

My understanding of our decisions is that the power to lay an ad valorem tax turns on the permanency of the property in the State. All the property may be there or only a fraction of it. Property in transit, whether a plane discharging passengers or an automobile refueling, is not subject to an ad valorem tax. Property in transit may move so regularly and so continuously that part of it is always in the State. Then the fraction, but no more, may be taxed ad valorem.

I mention these elemental points to reserve explicitly the validity of the apportionment formula that serves as the basis of this ad valorem tax. The formula used presents substantial questions. What might be an adequate formula for a gross receipts tax might be inadequate for an ad valorem tax. Moreover, when we are faced with a due process question, we have a problem we may not delegate to Congress.

I do not think the Court takes a position contrary to what I have said. But there are passages in the opinion which blur the constitutional issues as they are blurred and confused in the interesting report of the Civil Aeronautics Board, H. R. Doc. No. 141, 79th Cong., 1st Sess., entitled Multiple Taxation of Air Commerce. Hence I have joined in the judgment of the Court but not in the opinion.

MR. JUSTICE FRANKFURTER, dissenting.

One of the most treacherous tendencies in legal reasoning is the transfer of generalizations developed for one set of situations to seemingly analogous, yet essentially very different, situations. The doctrines evolved in adjusting rights as between the States to tax property bearing some relation to a number of States, and the taxing power of the States as against the freedom from

State interferences secured by the Commerce Clause, bear, of course, a practical relation to what it is that is taxed. It took a considerable time to make this adjustment in regard to taxation of railroad property and railroad income—to decide when the States are wholly excluded from levying certain taxes, when an ad valorem tax may be levied on railroad property reasonably deemed to be permanently in a given State, and on what basis income from interstate railroad business may fairly be apportioned among different States. Even as to railroads, nice distinctions had to be made and the making of them has not been concluded.

It stands to reason that the drastic differences between slow-moving trains and the bird-like flight of airplanes would be reflected in the law's response to the claims of the different States and the limitations of the Commerce Clause upon those claims. The differences in result and the conflict even among those who agreed in result in *Northwest Airlines* v. *Minnesota*, 322 U. S. 292, demonstrate not the contrariness or caprice of different minds but the inherent perplexities of the law's adjustment to such novel problems as the exercise of the taxing power over commercial aviation in a federal system. The problems canvassed in that case were unprecedented, and perhaps the most important thing that was there decided was the refusal of the Court to apply to air transportation the doctrines that had been enunciated with regard to land and water transportation.

The plain intimation of the case—that these novel problems, affecting the taxing power of the States and the Nation, call for the comprehensive powers of legislation possessed by Congress—found response in a resolution of Congress directing the Civil Aeronautics Board to develop the "means for eliminating and avoiding, as far as practicable, multiple taxation of persons engaged in air commerce . . . which has the effect of unduly

burdening or unduly impeding the development of air commerce." 58 Stat. 723. The inquiry thus set afoot produced an illuminating report. See H. R. Doc. No. 141, 79th Cong., 1st Sess., which analyzed the difficulties and also made concrete proposals.[1] The gist of these proposals was that Congress make an apportionment of taxes among the States over which air carriers fly, based upon relevant factors and in appropriate ratios. The basis of taxation by Nebraska, here under review, substantially reflects the factors which the Civil Aeronautics Board recommended to the Congress. It is one thing, however, for the individual States to determine what factors should be taken into account and how they should be weighted. It is quite another for Congress to devise, as the Civil Aeronautics Board recommended it should, a scheme of apportionment binding on all the States. Until that time, Nebraska may rely on one scheme of apportionment; other States on other schemes. And each State may, from time to time, modify the relevant factors.[2]

The exercise of the taxing power by one of the States by means of a formula, based on such criteria as tonnage, revenue, and arrivals and departures, may, in isolation, impose no unfair burden on commerce. And the adoption by all the States of such a basis for taxation, which only congressional action could ensure, would not offend the Commerce Clause. It is the diverse and fluctuating

---

[1] The proposal of this Report—that there be a uniform allocation formula to apportion taxes among the States—was adopted by the Council of State Governments. See 20 State Government 95. However no federal legislation has yet resulted.

[2] In addition to the problem of conflict between apportionment schemes of various States, it must be borne in mind that these schemes cannot be regarded as abstract mathematical formulas, and hence they must be closely scrutinized to ensure their fairness as applied to a given situation. See *Wallace* v. *Hines,* 253 U. S. 66.

exercise of power by the various States, even where based on concededly relevant factors, which imposes an undue burden on interstate commerce.[3]

The complexity of the proposals of the Board's Report—the items to be taken into account, the balance to be struck among them, the problem of giving the States their due without unfairly burdening an industry of vital national import—indicates how ill-adapted the judicial process is, as against the choices open to Congress, for dealing with these problems and how warily this Court should move within the limits of its own inescapable duty to act. The protection of interstate commerce against the burden of multiple taxation ought not to be left to litigation growing out of changes in the methods of taxation.

> "The immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment. Courts are not possessed of instruments of determination so delicate as to enable them to weigh the various factors in a complicated economic setting which, as to an isolated application of a State tax, might mitigate the obvious burden generally created by a direct tax on commerce." *Freeman* v. *Hewit,* 329 U. S. 249, 256.

---

[3] Lest it be thought one formula of apportionment is clearly the appropriate one, it should be noted that the Board's Report sets forth three formulas proposed by responsible groups, in addition to that recommended by the Board. And while Nebraska adopted the factors recommended by the Board, it did not give them the same weight which the Board's proposed formula did. See H. R. Doc. No. 141, 79th Cong., 1st Sess. 58.

This would not be the only instance in which a constructive adjustment of competing considerations requires congressional legislation and is beyond the scope of the judicial process. See, *Davis* v. *Department of Labor,* 317 U. S. 249, 259; *United States* v. *Standard Oil Co.,* 332 U. S. 301; *Halcyon Lines* v. *Haenn Ship Ceiling & Refitting Corp.,* 342 U. S. 282; *United States* v. *Gilman,* 347 U. S. 507.

It was not too difficult in *Northwest Airlines* to allow Minnesota to levy a personal property tax on the entire fleet of airplanes owned by a corporation of its creation, the principal place of business of which was also Minnesota. The State of Minnesota, as we said, was the only State that had such a hold on the planes. In the case before us, Nebraska has no such relation with the airplanes on which it seeks to impose an ad valorem tax.

This Court has held that a State may levy an ad valorem tax on the basis of a showing that the total time spent in a State by different units of a carrier's property is such that a certain proportion of that property may be said to have a permanent location in that State. Such a doctrine of apportionment, as the basis of property taxation, was adopted by this Court in *Pullman's Car Co.* v. *Pennsylvania,* 141 U. S. 18, with relation to railroad cars; and in *Ott* v. *Mississippi Barge Line Co.,* 336 U. S. 169, with relation to barges. But boats and railroad cars which spend hours and days at a time in a State have a closeness and duration of relationship to that State obviously not true of planes which make brief stopovers for a few minutes.

The appealing phrase that "interstate business must pay its way" can be invoked only when we know what the "way" is for which interstate business must pay. Of course, the appellant must pay for the use of airports and other services it enjoys in Nebraska. It

must pay a tax on all its property permanently located in Nebraska. Like everyone else it must pay a gasoline tax. In fact it pays approximately $22,000 a year for the use of the airport, $14,000 a year in gasoline taxes, and appropriate property taxes on office equipment, trucks and other items permanently in Nebraska.

But only those who have a sufficiently substantial relation to Nebraska that they may fairly be said to partake of the benefits, though impalpable and unspecific, it gives as an ordered society, may be taxed because they partake of those benefits. And even then, of course, an undue burden must not be cast on commerce. Not unless Nebraska can show that appellant has airplanes that have a substantially permament presence in Nebraska can Nebraska exert its taxing power on their presence. I do not believe that planes which pause for a few moments can be made the basis for the exercise of such power.[4] If Nebraska can tax without such a tie, every other State through which the planes fly or in which they alight for a few minutes can tax. Surely this is an obvious inroad upon the Commerce Clause and as such barred by the Constitution.

It cannot be said that for airplanes, flying regularly scheduled flights, to alight, stop over for a short time and then take off is so tenuously related to Nebraska that it would deny due process for that State to seize on these short stopovers as the basis of an ad valorem tax. But the incidence of a tax may offend the Commerce Clause, even though it may satisfy the Due Process Clause.

---

[4] With the exception of one plane which remains in Nebraska overnight, all of the Company's planes remain in Nebraska for periods of between five and twenty minutes each day. Considering this brief time spent on the ground by planes which stop in transit, more than a bare assertion that flight equipment is "permanently" in Nebraska is called for to establish the requisite permanence for taxing purposes.

I am not unaware that there is an air of imprecision about what I have written. Such is the intention. Until Congress acts, the vital thing for the Court in this new and subtle field is to focus on the process of interstate commerce and protect it from inroads of taxation by a State beyond "opportunities which it has given, . . . protection which it has afforded, . . . benefits which it has conferred by the fact of being an orderly, civilized society." *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 444.