MURDOCK, Judge,
dissenting.
The vessels in question are instrumen-talities of interstate commerce.[6] A state may tax such vessels without impermissi-bly burdening interstate commerce when the tax “[(1)] is applied to an activity with a substantial nexus with the taxing State, [(2)] is fairly apportioned, [(3)] does not discriminate against interstate commerce, and [(4)] is fairly related to the services provided by the State.” Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97“ S.Ct. 1076, 51 L.Ed.2d 326 (1977) (emphasis added). As a corollary, a domiciliary state is precluded from imposing an ad valorem tax on such vessels “to the extent [they] could be taxed by another State” under the four-pronged Complete Auto test. Central R.R. v. Pennsylvania, 370 U.S. 607, 614, 82 S.Ct. 1297, 8 L.Ed.2d 720 (1962) (emphasis in original; further noting that the limitation on a domiciliary’s taxing authority is not limited to such property as is actually subjected to tax elsewhere).
The “rule of apportionment” recognized in Complete Auto replaced the “homeport doctrine” enunciated in Hays v. Pacific Mail S.S. Co., 58 U.S. 596, 17 How. 596, 15 L.Ed. 254 (1855). Under the “home-port doctrine,” a vessel was subject to ad valo-rem taxation in full at the domicile of the owner, and nowhere else. (It was only if the vessel became so completely incorporated with the personal property of a non-domiciliary state — so as to acquire an “actual situs” there^ — 'that the vessel was not subject to taxation by the domiciliary state.) Since the United States Supreme Court’s decision in Japan Line, Ltd. v. *259 County of Los Angeles, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), however, no decision in any jurisdiction has held that the “home-port doctrine” continues to govern the taxation of vessels used in interstate commerce. The analysis of the Supreme Court in Japan Line explains why:
“The ‘home port doctrine’ enunciated in Hays was a corollary of the medieval maxim mobilia sequuntur personam (‘movables follow the person,’ see Black’s Law Dictionary 1154 (rev. 4th ed.1968)) and resulted in personal property being taxable in full at the domicile of the owner. This theory of taxation, of course, has fallen into desuetude, and the ‘home port doctrine, ’ as a rule for taxation of moving equipment, has yielded to a rule of fair apportionment among the States. This Court, accordingly, has held that various instrumen-talities of commerce may be taxed, on a properly apportioned basis, by the non-domiciliary States through which they travel. E.g., Pullman’s Palace Car Co. v. Pennsylvania, 141 U.S. 18, 11 S.Ct. 876, 35 L.Ed. 613 (1891); Ott v. Mississippi Valley Barge Line Co., 336 U.S. 169, 69 S.Ct. 432, 93 L.Ed. 585 (1949); Braniff Airways, Inc. v. Nebraska State Bd. of Equalization, 347 U.S. 590, 74 S.Ct. 757, 98 L.Ed. 967 (1954). In discarding the ‘home port’ theory for the theory of apportionment, however, the Court consistently has distinguished the case of oceangoing vessels. E.g., Pullman’s Palace, 141 U.S., at 23-24, 11 S.Ct. at 878 (approving apportioned tax on railroad rolling stock, but distinguishing vessels ‘engaged in interstate or foreign commerce upon the high seas’); Ott, 336 U.S., at 173-74, 69 S.Ct. at 434 (approving apportioned tax on barges navigating inland waterways, but ‘not reaching] the question of taxability of ocean carriage’); Braniff, 347 U.S., at 600, 74 S.Ct. at 763 (approving apportioned tax on domestic aircraft, but distinguishing vessels ‘used to plow the open seas’). Relying on these cases, appellants argue that the ‘home port doctrine,’ yet vital, continues to prescribe the proper rule for state taxation of oceangoing ships. Since containers are ‘functionally a part of the ship,’ Leather’s Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 815 ([2d Cir.] 1971), appellants conclude, the containers, like the ships, may be taxed only at their home ports in Japan, and thus are immune from tax in California.
“Although appellants’ argument, as will be seen below, has an inner logic, we decline to cast our analysis of the present case in this mold. The ‘home port doctrine’ can claim no unequivocal constitutional source; in assessing the legitimacy of California’s tax, the Hays Court did not rely on the Commerce Clause,, nor could it, in 1854, have relied on the Due Process Clause of the Fourteenth Amendment. The basis of the ‘home port doctrine,’ rather was common-law jurisdiction to tax. Given its origins, the doctrine could be said to be ‘anachronistic’; given its underpinnings, it may indeed be said to have been ‘abandoned.’ Northwest Airlines, Inc. v. Minnesota, 322 U.S. 292, 320, 64 S.Ct. 950, 88 L.Ed. 1283 (1944) (Stone, C.J., dissenting).”
Japan Line, 441 U.S. at 442-43, 99 S.Ct. 1813 (emphasis added; footnote omitted).
The Supreme Court went on to discuss California’s attempt to tax foreign-owned shipping containers passing through that state in international commerce. It stopped short of permitting California to impose a tax on the containers; California simply did not have any authority to tax the containers in question, because they were foreign-owned and were employed in *260 international commerce. As the Supreme Court observed, “[w]hen construing Congress’ [Article I] power to ‘regulate Commerce with foreign Nations,’ a more extensive constitutional inquiry is required.” Japan Line, 441 U.S. at 446, 99 S.Ct. 1813.[7] The opinion of the Court, however, left little doubt that the containers would have been taxable under the rule of apportionment if they had been instrumentalities of interstate commerce:
“[California] contend[s] that cargo shipping containers, like other vehicles of commercial transport, are subject to property taxation, and that the taxes imposed here meet Complete Auto’s fourfold requirements. The containers, they argue, have a ‘substantial nexus’ with California because some of them are present in that State at all times; jurisdiction to tax is based on ‘the habitual employment of the property within the State,’ Braniff, 347 U.S., at 601, 74 S.Ct. 764, and appellants’ containers habitually are so employed. The tax, moreover, is ‘fairly apportioned,’ since it is levied only on the containers’ ‘average presence’ in California. The tax ‘does not discriminate,’ thirdly, since it falls evenhandedly on all personal property in the State; indeed, as an ad valorem tax of general application, it is of necessity nondiseriminatory. The tax, finally, is ‘fairly related to the services provided by’ California, services that include not only police and fire protection, but also the benefits of a trained work force and the advantages of a civilized socie
“These observations are not without force. We may assume that, if the containers at issue here were instrumental-ities of purely interstate commerce, Complete Auto would apply and be satisfied, and our Commerce Clause inquiry would be at an end.”
Japan Line, 441 U.S. at 445, 99 S.Ct. 1813 (emphasis added; footnote omitted).[8]
Because the containers in Japan Line were instrumentalities of foreign commerce, and not “instrumentalities of purely interstate commerce,” the four-pronged test of Complete Auto did not apply. The vessels at issue in the present case, however, are “instrumentalities of purely interstate commerce.” I conclude, therefore, that the four-pronged test of Complete Auto, including the rule of apportionment, does apply in this case, and that the “home-port doctrine” is not applicable.[9]
As the domiciliary state for the vessels at issue, however, Alabama need not be concerned with the potential for fair apportionment of taxes on the vessels between it and another jurisdiction unless, as a threshold matter, Gulf Caribe has demonstrated that the vessels have a “substantial nexus” with — also known as a “taxable *261 situs” in — another “state,” in this case Puerto Rico. Unlike the majority, I believe the evidence submitted by Gulf Caribe made such a showing, and I therefore must dissent.
Not unlike the present ease, in Japan Line, the containers at issue were each in the State of California only about 3 weeks out of every 52. See Japan Line, 441 U.S. at 445 n. 8, 99 S.Ct. 1813 (accepting taxation of 3/52 of Japan Line’s containers at full value as a proxy for taxing all of Japan Line’s containers at 3/52 value). The appellant argued that the vessels satisfied the “habitual employment of the property within the State” test articulated in Braniff Airways, Inc. v. Nebraska State Bd. of Equalization, 347 U.S. 590, 74 S.Ct. 757, 98 L.Ed. 967 (1954), as a measure of whether a “substantial nexus” exists. I believe the same argument has merit in the present case.
I also find instructive the reasoning of the United States Supreme Court in Ott v. Mississippi Valley Barge Line Co., 336 U.S. 169, 69 S.Ct. 432, 93 L.Ed. 585 (1949). In Ott, the Supreme Court upheld the authority of the City of New Orleans and the State of Louisiana to tax, on an apportioned basis, tugboats and barges engaged in interstate commerce along the Mississippi River. The taxpayer operated a fleet of vessels that called on the Port of New Orleans only for the purpose of loading and unloading cargo, and, on occasion, to make necessary and temporary repairs. Ott, 336 U.S. at 171, 69 S.Ct. 432. The Court noted that “turnarounds” were accomplished as quickly as possible so that the vessels were present in Louisiana for relatively short periods.[10] I find the contacts between Gulf Caribe’s vessels and the Puerto Rican port to be quite similar to the contacts that were held in Ott to establish a taxable situs. See also Standard Oil Co. v. Peck, 342 U.S. 382, 72 S.Ct. 309, 96 L.Ed. 427 (1952). Thus, the following observation of the Supreme Court in Ott is apposite:
“In the trips to Louisiana a tugboat brings a line of barges to New Orleans where the barges are left for unloading and reloading. Then the tugboat [picks] up loaded barges for return trips to ports outside that state. There is no fixed schedule for movement of the barges. But the turn-arounds are accomplished as quickly as possible with the result that the vessels are within Louisiana for such comparatively short periods of time as are required to discharge and take on cargo and to make necessary and temporary repairs.”
Ott, 336 U.S. at 170-71, 69 S.Ct. 432 (emphasis added).
The Kentucky case of Union Barge Line Corp. v. Marcum, 360 S.W.2d 130 (Ky.App.1962), likewise is instructive. The tugs and barges at issue in that case were engaged in commerce along the Ohio River. The taxpayer contended that its property acquired no taxable situs in Kentucky because none of the vessels were permanently in that state; the vessels were engaged only in sporadic loading and discharging of cargo in Kentucky and did not run on scheduled or fixed routes. In rejecting this argument and affirming the apportioned assessment, the Kentucky court held:
“The nature and extent of interstate transportation operations have been the controlling factors in determining whether a particular state may levy a tax upon transient property. We may assume that casual, or sporadic, or occasional movements of the implements of a *262 transportation enterprise into and out of a state do not furnish a sufficient nexus or link between a local taxing power and a foreign corporation. The solution of the problem is really a practical one. If such movements are sufficiently substantial, continuous and constant, then the state necessarily furnishes such benefits and protection as will warrant its demand for a quid pro quo by way of a fairly apportioned tax.
“Appellants contend that their operations do not constitute a definable ‘system,’ nor do they have a ‘permanence,’ which are criteria mentioned in some of the cases.... The fact that because of the nature of the business appellants do not operate their boats and barges on a fixed schedule does not necessarily mean that there is not a systematic utilization of Kentucky territory (i.e., the waterways); nor does the lack of a fixed schedule or the fact that the exigencies of traffic affect the scope of operations necessarily mean that such operations are of a nonpermanent nature.
“Appellants conduct a substantial, regular and continuous business through Kentucky. The general route is fixed. The absence of specific schedules simply makes more difficult the determination of a fair apportionment, but it does not negative an habitual and continuous use of Kentucky territory.”
Union Barge Line, 360 S.W.2d at 132-33 (some emphasis added; citations omitted).
Citing Central Railroad Co. of Pennsylvania v. Pennsylvania, 370 U.S. 607, 82 S.Ct. 1297, 8 L.Ed.2d 720 (1962), the Revenue Commissioner argues that Gulf Caribe did not maintain “fixed and regular routes” in Puerto Rico and, therefore, has not established a tax situs there. The reference to “fixed and regular routes” in Central Railroad, however, was a function of the particular facts of that case. In response to its own emphasis on the fact that the taxpayer bore the burden of proving an exemption from Pennsylvania’s tax, the Supreme Court noted certain facts peculiar to a particular group of railcars owned by the taxpayer — namely, that the cars ran “on fixed routes and regular schedules” — was sufficient to satisfy that burden. 370 U.S. at 613, 82 S.Ct. 1297. The focus on such fixed and regular routes did not constitute an announcement of a rule of law that must be met in every case in order to satisfy the “substantial nexus” test under Complete Auto. Indeed, even as to railcars, which by their nature are more susceptible to running on a “fixed route and regular schedule” than other vessels, the Supreme Court explained that “a non-domiciliary tax situs may be acquired even if the rolling stock does not follow prescribed routes and schedules in its course through the nondomiciliary State.” Id. at 615, 82 S.Ct. 1297. Thus, as to a second group of cars at issue, the Supreme Court observed:
“[T]he cars ‘never were run in said state in fixed numbers nor at regular times, nor as a regular part of particular trains.’ [Nonetheless, h]abitual employment within the State of a substantial number of cars, albeit on irregular routes, may constitute sufficient contact to establish a tax situs permitting taxation of the average number of cars so engaged.
“On the record before us, however, we find no evidence, except as to [a separate group of] cars, of either regular routes through particular nondomiciliary States or habitual presence, though on irregular missions, in particular nondo-miciliary States.”
Id. (emphasis added; citation omitted).
In contrast to Central Railroad, where the Court noted a failure to show employment of a “substantial number” of cars *263 within the taxing jurisdiction, all of the vessels at issue in the present case were employed in Puerto Rico. Although, as explained in more detail below, I believe Gulf Caribe’s vessels also were employed on frequent and regular routes to and within Puerto Rico, at a minimum, it certainly could be said, as it was in Central Railroad, that the vessels in question maintain a “habitual presence, though on irregular missions” in Puerto Rico.
I also find the United States Supreme Court decision in Braniff Airways, Inc. v. Nebraska State Board of Equalization, 347 U.S. 590, 74 S.Ct. 757, 98 L.Ed. 967 (1954), supportive. In Braniff, the Supreme Court considered the taxation of aircraft by the State of Nebraska:
“The home port registered with the Civil Aeronautics Authority and the overhaul base for the aircraft in question is the Minneapolis-St. Paul Airport, Minnesota. All of the aircraft not undergoing overhaul fly regular schedules upon a circuit ranging from Minot, North Dakota, to New Orleans, Louisiana, with stops in fourteen states including Minnesota, Nebraska and Oklahoma. No stops were made in Delaware. The Nebraska stops are of short duration since utilized only for the discharge and loading of passengers, mail, express, and freight, and sometimes for refueling. Appellant neither owns nor maintains facilities for repairing, reconditioning, or storing its flight equipment in Nebraska, but rents depot space and hires other services as required.”
347 U.S. at 592, 74 S.Ct. 757 (emphasis added). Against these facts, the United States Supreme Court concluded that there was
“regular contact ... sufficient to establish Nebraska’s power to tax even though the same aircraft do not land every day and even though none of the aircraft is continuously within the state. ‘The basis of the jurisdiction is the habitual employment of the property ioith-in the State.’ Appellant rents its ground facilities and pays for fuel it purchases in Nebraska. This leaves it in the position of other carriers such as rails, boats and motors that pay for the use of local facilities so as to have the opportunity to exploit the commerce, traffic, and trade that originates in or reaches Nebraska.”
347 U.S. at 601, 74 S.Ct. 757 (emphasis added; footnote omitted). Similarly, I conclude that the record in the present case amply demonstrates that Gulf Caribe uses the local facilities in Ponce, Puerto Rico, “so as to have the opportunity to exploit the commerce, traffic, and trade that originates in or reaches” Puerto Rico.
In Ott, there was “no fixed schedule for movement”; the “turnarounds” of the vessels in the New Orleans port were simply “accomplished as quickly as possible.” The lack of a fixed or regular route in Ott and the sporadic timing and limited duration of the visits did not prevent a finding of a “taxable situs” in Louisiana:
“We see no practical difference so far as either the Due Process Clause or the Commerce Clause is concerned whether it is vessels or railroad ears that are moving in interstate commerce. The problem under the Commerce Clause is to determine ‘what portion of an interstate organism may appropriately be attributed to each of the various states in which it functions.’ So far as due process is concerned the only question is whether the tax in practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing State....
“... We can see no reason which should put water transportation on a *264 different constitutional footing than other interstate enterprises.” [11]
336 U.S. at 174, 69 S.Ct. 432 (emphasis added; citations omitted).
Based on the record in the present case, I conclude that ad valorem taxation of the vessels by Puerto Rico would have relation to “opportunities, benefits, and protection conferred and afforded” by Puerto Rico. In each of the two tax years in question, each of the vessels at issue made approximately 18 round-trips between Mobile, Alabama, and Ponce, Puerto Rico. On each of these voyages, the vessels were present in Puer-to Rico an average of two days, and on some occasions were docked in Ponce, Puerto Rico, for between three and five days.
More importantly, the vessels were dedicated to carriage solely between Mobile, Alabama, and Ponce, Puerto Rico. In fact, although the vessels were owned by Gulf Caribe, they were leased to Chemex Corporation, a company with facilities in both Ponce, Puerto Rico, and Mobile, Alabama. As quickly as they could be loaded and prepared for a return voyage to Puerto Rico from Mobile, they returned to Puerto Rico, where they docked to a facility leased for their use by Chemex. They traveled to no other destination. Their trips, therefore, were as “fixed” and on as “regular” a route as the nature of the business in which the companies were engaged would allow.[12]
These were not fortuitous, sporadic, or casual contacts with Puerto Rico. Rather, during the tax years in question and throughout the 10-year history of their operations, Gulf Caribe and the vessels have engaged in frequent, systematic, and substantial contact with Puerto Rico.
As a result, the vessels were either traveling through Puerto Rican waters or docked in a Puerto Rican harbor approximately 10% of each year.[13] After traveling *265 through Puerto Rican waters, the vessels came to rest in a Puerto Rican harbor. They were physically anchored and/or docked to Puerto Rican soil or “property.” The vessels “attached” themselves to a Puerto Rican port facility. Gulf Caribe’s personnel would unload the vessels’ cargo onto this facility.
Furthermore, Gulf Caribe and its personnel took advantage of Puerto Rico’s physical, economic, and political infrastructure.[14] Gulf Caribe and its personnel made substantial use of public roadways and other public works, as well as private services, in connection with their use of air and ground transportation and hotel accommodations within Puerto Rico. While in Puerto Rico, Gulf Caribe and its vessels and personnel necessarily received the benefit of police and fire protection and other public services provided by Puerto Rico. The record contains evidence of contacts with Puerto Rico relating to the operation, maintenance, and repair of the vessels by both Gulf Caribe personnel and Puerto Rican firms, as well as the purchase in Puerto Rico of parts needed to make repairs, the transportation of Gulf Caribe personnel to and from Puerto Rico, the securing within Puerto Rico of medical services, and the provision of assistance to its customer, Chemex, with repairs to locomotives located in Puerto Rico. Among other things, Gulf Caribe also contracted with Puerto Rican companies to repair property damaged by the vessels in Puerto Rico. Albeit of less duration than the presence of the vessels and their crew, other Gulf Caribe personnel have a regular presence in Puerto Rico for the purpose of attending operational meetings and negotiating contracts.
In short, Gulf Caribe, its vessels, and personnel realize “opportunities, benefits, and protection conferred or afforded by Puerto Rico sufficient to satisfy the demands of due process as a prerequisite for taxation.” See Ott, 336 U.S. at 174, 69 S.Ct. 432. Accordingly, I conclude that the Revenue Commissioner could not, consistent with the Due Process Clause and the Commerce Clause, assess ad valorem taxes on the vessels at their full value and without an appropriate apportionment of that value as between Puerto Rico and Alabama. I therefore must respectfully dissent.

. A territory or possession of the United States, such as Puerto Rico, is considered a state for purposes of the regulation of interstate commerce. See Puerto Rico Maritime Shipping Auth. v. Interstate Commerce Comm’n 645 F.2d 1102, 1105 (D.C.Cir.1981).

. In distinguishing between the ability of a stale to tax a foreign-owned vessel employed in international commerce and a domestically owned vessel, the Supreme Court expressed concerns regarding the risk of multiple taxation and the potential impairment of our Nation's ability to speak with "one voice” in international affairs. Id. at 446-49, 99 S.Ct. 1813.

. In his separate writing in this case, Judge Crawley notes that he "believes that the Court will, when clearly presented the issue, overrule what it has already characterized as an 'anachronistic' and quite possibly 'abandoned’ doctrine. Japan Line, 441 U.S. at 443[, 99 S.Ct. 1813].”

.The probate court and the revenue commissioner rely in part upon Alabama Supreme Court decisions in National Dredging Co. v. State, 99 Ala. 462, 12 So. 720 (1893), and Tennessee Coal, Iron & R.R. v. State, 239 Ala. 19, 193 So. 143 (1939). These cases, however, were decided at a time when the "home-port doctrine” prevailed. As noted, that doctrine has now yielded to the rule of apportionment, and these Alabama cases, therefore, do not govern the disposition of the present case.

. The time the vessels were physically located at a Louisiana dock ranged from 2.2% to 17.5% of the year. Ott, 336 U.S. at 171 n. 1, 69 S.Ct. 432.

.Nor do I see any reason why there should be any difference in taxation between vessels engaged in purely interstate commerce that accomplish that commerce solely within the territorial waters of two or more states and vessels that accomplish their commerce by way of a route that also takes them through international waters. Thus, I see no basis for allowing a vessel engaged only in interstate commerce between, for example, Mobile, Alabama, and Tampa, Florida, to avoid ad valo-rem taxation on the full value of its vessel simply because it leaves Alabama's territorial waters, crosses a portion of the Gulf of Mexico, and then enters Florida's territorial waters. Despite its use of international waters, the vessel is a domestic vessel engaged in interstate commerce and, as between Florida and Alabama, its full value may be taxed, just as could a vessel that elected to travel between Alabama and Florida solely by way of the territorial waters of each State.
I also note that the “finding” of the probate court that the vessels did not acquire a taxable situs in Puerto Rico because they supposedly “never moved through Puerto Rico at all [but rather] travel to Puerto Rico, not through it” does not comport with either the record or the law. The undisputed evidence is that the vessels travel through the territorial waters of Puerto Rico (which extend three marine leagues offshore; see 48 U.S.C. § 749) and physically dock on Puerto Rican soil. Moreover, I see no basis in the case law for making a distinction between traveling "to” another state, as opposed to "through it.”

. In the words of the Kentucky court in Union Barge Line, “[t]he fact that because of the nature of the business appellants do not operate their boats and barges on a fixed schedule does not necessarily mean there is not a systematic utilization of [Puerto Rico] territory (i.e., the waterways).” 360 S.W.2d at 132-33. The absence of specific schedules may add a step or two to the calculations needed to determine a fair apportionment, but it does not negative the frequent, habitual, and substantial use of Puerto Rican territory.

. According to Gulf Caribe's calculations, the vessels were present in Puerto Rico for approximately 10% of the year in each of the two tax years in question; the vessels were present in Alabama from 22% to 32% of each of the tax years. Therefore, the vessels were *265 present in Puerto Rico approximately one-third to one-fourth of the total time that they were present in either of the two jurisdictions with authority to tax their value.

. See Japan Line, 441 U.S. at 445, 99 S.Ct. 1813 ("The tax ... is ‘fairly related to the services provided by’ California, services that include not only police and fire protection, but also the benefits of a trained work force and the advantages of a civilized society.”).