DISTRICT OF COLUMBIA, Petitioner,

v.

GENERAL MOTORS CORPORATION,
Respondent.

Nos. 17017, 17018.

United States Court of Appeals
District of Columbia Circuit.

Reargued May 15, 1963.

Decided Feb. 13, 1964.

On Petition for Modification of
Judgment May 7, 1964.

Certiorari Granted Oct. 26, 1964.
See 85 S.Ct. 156.

Mr. Henry E. Wixon, Asst. Corp. Counsel for the District of Columbia, with whom Messrs. Chester H. Gray, Corp. Counsel, Milton D. Korman, Principal Asst. Corp. Counsel, and Robert E. McCally, Asst. Corp. Counsel, were on the brief, for petitioner.

Mr. Donald K. Barnes, Detroit, Mich., of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of court, with whom Messrs. Seymour S. Mintz and William T. Plumb, Jr., Washington, D. C., were on the brief, for respondent. Mr. Frank F. Roberson, Washington, D. C., also entered an appearance for respondent.

Before BAZELON, Chief Judge, WILBUR K. MILLER, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER, WRIGHT and McGOWAN, Circuit Judges sitting en banc.

McGOWAN, Circuit Judge, with whom Chief Judge BAZELON and Circuit Judges FAHY, WASHINGTON and WRIGHT join:

These petitions for review from the District of Columbia Tax Court involve the propriety of assessments under the District's Income and Franchise Tax Act against General Motors Corporation for the years 1957 and 1958. The tax is levied

on the net income of General Motors for the privilege of carrying on business within the District; and, as such, is similar to taxes levied by many of the States. The question before this court concerns the legally permissible formula for determining that portion of the net income of a unitary multi-state business which is properly taxable by the District of Columbia. The Tax Court ruled that the District's single-factor formula of apportionment was not permitted by the statute; and, on its own initiative, substituted a three-factor formula. A division of this court, one judge dissenting, affirmed the Tax Court. Because of the importance of the problem to the administration of local taxes, we granted the District's petition for rehearing *en banc*. We now decide that the decisions of the Tax Court must be reversed.

I

The District of Columbia Code imposes a "franchise tax upon every corporation * * * for the privilege of carrying on or engaging in any trade or business within the District and of receiving such other income as is derived from sources within the District," to be measured by "that portion of the net income of the corporation * * * as is fairly attributable" to that business.[1] Where the business "is carried on or engaged in both within and without the District, the net income derived therefrom shall * * be deemed to be income from sources within and without the District," and the portion subject to tax shall be determined by regulations prescribed by the District Commissioners.[2]

Under regulations promulgated August 6, 1953, the formula for determining the

1. D.C.Code § 47-1580:

"It is the purpose of this subchapter to impose (1) an income tax upon the entire net income of every resident and every resident estate and trust, and (2) a franchise tax upon every corporation and unincorporated business for the privilege of carrying on or engaging in any trade or business within the District and of receiving such other income as is derived from sources within the District: *Provided, however*, That, in the case of any corporation, the amount received as dividends from a corporation which is subject to taxation under this subchapter, and, in the case of a corporation not engaged in carrying on any trade or business within the District, interest received by it from a corporation which is subject to taxation under this subchapter shall not be considered as income from sources within the District for the purposes of this subchapter. The measure of the franchise tax shall be that portion of the net income of the corporation and unincorporated business as is fairly attributable to any trade or business carried on or engaged in within the District and such other net income as is derived from sources within the District; *Provided further*, That income derived from the sale of tangible personal property by a corporation or unincorporated business not carrying on or engaging in trade or business within the District as defined in sections 47-1551 to 47-1551c shall not be considered as income from sources within the District for purposes of this subchapter, with the exception of income from sale to the United States not excluded from gross income as provided in section 47-1557a(b) (13)."

2. D.C.Code § 47-1580a:

"The entire net income of any corporation or unincorporated business, derived from any trade or business carried on or engaged in wholly within the District shall, for the purposes of this subchapter, be deemed to be from sources within the District, and shall, along with other income from sources within the District, be allocated to the District. If the trade or business of any corporation or unincorporated business is carried on or engaged in both within and without the District, the net income derived therefrom shall, for the purposes of this subchapter, be deemed to be income from sources within and without the District. Where the net income of a corporation or unincorporated business is derived from sources both within and without the District, the portion thereof subject to tax under this subchapter shall be determined under regulation or regulations prescribed by the Commissioners. The Assessor is authorized to employ any formula or formulas provided in any regulation or regulations prescribed by the Commissioners under this subchapter which, in his opinion, should be applied in order to properly determine the net income of any corporation or unincorporated business subject to tax under this subchapter."

The rate of tax is 5% (D.C.Code § 47-1571a) of the corporation's "taxable income," which is defined in D.C.Code §

tax of a sales corporation engaged in business "partly within and partly without the District" is based on a sales factor. The portion taxed by the District is the percentage of the corporation's total net income (determined under other sections of the District Code not here in direct controversy) that its "District sales made during such taxable year bear to the total sales made everywhere during such taxable year." [3]

For the taxable years 1957 and 1958, General Motors paid a small tax on the theory that only that portion of its income which was derived from business conducted through a District office of one of its divisions constituted "District sales" which were "fairly attributable" to business done within the District. General Motors contended that other sales to dealers in the District did not constitute "trade or business" within the

1571 as "the amount of net income derived from sources within the District within the meaning of sections 47–1580 to 47–1580b."

3. "Section 10.2–(b): 'Allocated' and 'Apportioned' Defined. The word 'allocated' as hereinafter used in reference to income and deductions therefrom means a determination based upon actual figures specifically applicable thereto; and the word 'apportioned' as hereinafter used in reference to net income means a ratable portion determined on a percentage basis. If the entire net income is derived from engaging in a trade or business within the District or from sources within the District, all of such income shall be allocated to the District. If the net income is derived from engaging in a trade or business partly within and partly without the District, or from sources both within and without the District, such income shall be allocated and apportioned in accordance with the specific provisions or formulae prescribed in these Regulations."

"Section 10.2–(c): Income Attributed to the District of Columbia. If the trade or business is carried on or engaged in wholly within the District, the entire net income from trade or business shall be allocated to the District. If the trade or business is carried on partly within and partly without the District, that portion of the net income from trade or business to be apportioned to the District shall be determined as follows:

(1) Income from sales of tangible personal property.

(a) Where income for any taxable year is derived from the manufacture and sale or purchase and sale of tangible personal property, the portion thereof to be apportioned to the District shall be such percentage of the total of such income as the District sales made during such taxable year bear to the total sales made everywhere during such taxable year. Every corporation and unincorporated business which carries on or engages in business in the District within the meaning of the words 'trade or business' as defined in the Act is, unless specifically exempted by some provisions of the Act, subject to tax. For the purpose of this regulation, the phrase 'District sales' shall mean all sales to District customers the income from which is fairly attributable to the trade or business carried on or engaged in within the District, including solicitation in the District by salesmen or other representatives of the taxpayer, that portion of sales to customers outside the District the income from which is fairly attributable to the trade or business carried on in the District, and sales of tangible personal property the income from which is from District sources."

These sections are as numbered in the Regulations of July 24, 1956, which reenacted without change the provisions relevant to this case.

On July 14, 1961, the District promulgated new regulations, in response to this court's decision in District of Columbia v. Gallant Inc., 110 U.S.App.D.C. 202, 290 F.2d 745 (1961). The controversy in *Gallant* concerned the definition of "District sales," which was found deficient in the earlier regulations, rather than the propriety of the apportionment formula. As will be seen, only the latter point is at issue here. The apportionment formula remained the same as in the 1953 regulations. In *Gallant*, after a remand to the Tax Court and after the new regulations were promulgated, the case again came before this court. 113 U.S.App. D.C. 92, 305 F.2d 761 (1962). We held that the 1961 regulations could not be applied retroactively to determine the tax liability for 1956, but we expressed "no opinion as to whether the 1961 amendments are valid or whether they may in other cases or circumstances be applied retroactively." Since in this case the issue involved is the same under both the new and old regulations, we have no occasion to reconsider our holding in *Gallant.*

District. The District refused to accept the returns for either year, and in 1959 mailed notices of tax deficiencies. The District's theory was that income derived from sales of automobiles, other vehicles, and parts to dealers in the District was income from a "trade or business" carried on "partly within and partly without the District," and hence subject to apportionment for the purpose of determining the tax owed to the District. General Motors duly protested the notices of proposed deficiencies. After a hearing, the District Finance Officer rejected the protests and on February 4, 1960, a formal assessment of taxes due was mailed to the company.

General Motors paid the assessment under protest, and appealed to the Tax Court. In that court, two primary arguments were urged as to the invalidity of the assessed deficiencies: one, that the numerator of the sales formula was too broad, in that it included sales which were not "District sales"; and, two, that use of the single-factor apportionment formula itself was permitted neither by the District Code nor by the Constitution. General Motors requested that all of the additionally assessed tax be refunded.

The Tax Court reversed the assessment, but not to the extent prayed for by General Motors. That court held the single-factor sales formula unauthorized by the District Code, and, in its place, substituted a three-factor formula of property, payroll and sales, each factor receiving equal weight.[4] The result was a tax substantially less than the District's assessment, but also substantially in excess of the amount originally paid by the taxpayer.

Only the District has appealed from the decisions of the Tax Court. General Motors has not, by an appeal of its own, pressed its original request to have the entire additional assessment refunded. For purposes of this appeal, it appears to concede the correctness of the figures found by the Tax Court as representing "District sales." The controversy before us, therefore, does not relate to the definition of what sales by General Motors properly may be taken to be "District sales," made in the course of a business activity which is carried on both within and without the District. It relates, rather, to the formula to be used for apportioning to the District that part of General Motors entire net income attributable to its "District sales." The District, of course, contends that the single-factor formula is valid. In addition, the District presents an alternative argument which was not made in the Tax Court, namely, that sales to dealers is "other income * * * derived from sources within the District." General

4. Numerous qualified economists testified for General Motors in the Tax Court. The general consensus of their testimony, relating to a unitary business such as the manufacture and sale of personal property, was that the income realized from the sale of a finished product is earned by the business as a whole, *i. e.*, by the combination of labor and capital beginning with the first stage in the manufacturing process, and ending with the final sale. They contended that the single-factor sales formula utilized by the District actually allocates to the jurisdiction where the final sale occurs all of the income which is earned at all stages. The Tax Court agreed. Because all of the products sold in the District were manufactured in other states, it "found" that the income from a sale made in the District was actually earned "partly within and partly without" the District, and that the sales formula did not apportion that income as required by the District Code. The court held that the proper formula was one utilizing a combined ratio of General Motors' property in the District to total property, District payroll to total payroll, and District sales to total sales. The sales figures involved and not now in controversy are as follows:

| | *1957* | *1958* |
|---|---|---|
| Total sales | $9,461,855,874.00 | $7,853,393,381.00 |
| District sales | 37,185,704.00 | 32,542,519.00 |
| Net Income (to be apportioned) | 1,312,092,839.15 | 653,396,893.13 |

Motors argues, first, that the District Code does not permit a formula based only on the sales factor; and, second, that such a formula, if authorized by the statute and as applied to it, is barred by the due process and commerce clauses of the Constitution. The Tax Court did not reach the constitutional issues.

II

Although not critical to a determination of this appeal in its present posture, some analysis of General Motors' operations in the District enlarges understanding of the issue we do face. The company's principal business is the manufacture and sale of automobiles, trucks and other vehicles, and parts and accessories. No manufacturing or assembly is conducted within the District, but takes place primarily in Michigan, Delaware, and Maryland as to products sold in the District. Orders from dealers are received and filled, and title passes, outside the District.

In addition to a central management staff located primarily in Detroit, Michigan, General Motors is organized into divisions, which operate substantially independently of each other. Of the five Car Divisions, four (Pontiac, Buick, Oldsmobile, and Chevrolet) have substantially identical operations throughout the country. Within the District in 1957 and 1958, Pontiac and Buick had four dealers each, Oldsmobile and Chevrolet five each. Subject to certain exceptions immaterial here, these divisions sold their products only to authorized dealers.

Each dealer operated under a "Dealer Selling Agreement" which contained a detailed recitation of the parties' obligations. Besides dealing with price (to the dealer, who was not obligated to resell the product at a particular price) and delivery terms, the agreement required the dealer to maintain a satisfactory place of business. Once the dealer was established in facilities and at a location mutually satisfactory to himself and the division, he agreed not to move to or establish a new or different location, branch sales office, branch service station, or place of business, including any used car lot or location, without the prior written approval of the division. Each dealer agreed to maintain specified standards for capital and net worth. He was required to use a uniform accounting system and submit 90-day sales projections, monthly financial and operating statements, and 10-day reports of sales and inventories; and to permit the company to examine his accounts and records when requested. Each agreement required satisfactory sales performance and service to purchasers, and an adequate staff and inventory of parts and accessories. The dealer was also required to erect certain specified signs necessary to advertise the company's products on a mutually satisfactory basis. Finally, the company could terminate the agreement for failure of the dealer to comply with its terms, and a dealer could terminate with or without cause by giving thirty days' notice.

The company's Motors Holding Division, with an office in the District, provided temporary financial assistance for the establishment, reorganization, or expansion of dealerships. In 1957 and 1958, four of the eighteen dealers in the District were receiving this financial aid. Under the program, the dealer provided at least twenty-five per cent of the required capital, and Motors Holding provided the remainder, in return for voting control. The dealer was required to buy Motors Holdings' interest under a formula geared to operating results. During the program, he was required to submit financial reports every ten days, and an accounting supervisor and branch manager made periodic inspection visits.

Additional inventory financing was available to established dealers through General Motors Acceptance Corporation, a wholly-owned subsidiary which had an office in the District. When a dealer utilized this financing, security title passed to GMAC at the factory. During

1957 and 1958, the four District Pontiac dealers were financed by GMAC.[5]

For administrative purposes, each of the divisions had subdivided the country into "regions." Each region was further subdivided into "zones." As stipulated by the parties, the activities of the Pontiac Division organization are typical. The regional office which served the District was located in New York City. A zone office located in Chevy Chase, Maryland, part of the Washington Metropolitan Area, served the District, most of Virginia and Maryland, and small parts of Pennsylvania and West Virginia.[6] There were 120 Pontiac dealers in the zone in the taxable years here involved. The zone manager and his assistant made periodic visits, (approximately once a month) to each dealer in the zone, for the purpose of advising on market opportunities, furthering the sale of promotional literature, and maintaining dealer interest in company items to aid the sale of Pontiac automobiles.

These goals were also furthered by one of four district managers who spent all of his time visiting dealers in the Washington Metropolitan Area (28 dealerships). Once a month each dealer submitted to the district manager a 90-day projection of new car requirements. Actual orders for new cars were usually sent directly to the zone office, although the district manager personally took orders to that office on occasion. The orders were processed at the zone office and forwarded for final approval to an assembly plant, where they were filled for shipment, f. o. b. factory, by common carrier directly to the dealer. The zone office also maintained a warehouse outside the District where a small inventory of new cars was kept, and sold from 50–100 cars a month therefrom. When purchased in this manner, the dealer himself would pick up the car from the warehouse.

Other zone office personnel who spent all or a portion of their time visiting and working with the dealers included an assistant zone manager (fifty per cent of his time); a business management manager (seventy-five per cent); a parts and service manager (seventy-five per cent); a claims administrator and his assistant (ninety per cent and one hundred per cent, respectively); and three service representatives (one hundred per cent). In addition to zone office personnel, national and regional Pontiac representatives made periodic visits to the zone.

With one exception, none of these Car Divisions maintained offices in the District. Chevrolet had a regional office in the District which supervised five zones. No dealer orders passed through the District office, but instead were sent directly to the Baltimore zone office, which also served the District. Personnel from Baltimore operated in the District in essentially the same manner as Pontiac's zone personnel. The Baltimore zone was responsible for processing owners' complaints regarding service by District dealers. It also initially passed upon applications for new dealerships, scrutinizing the business history and credit of an applicant. The regional office in the District then received the application and forwarded it with a recommendation to the Detroit office for final approval. A fleet manager worked out of Chevrolet's regional office in the District. His function was to be in touch with local and national fleet users and promote fleet orders. Approximately forty per cent of his time was spent in Washington.

The Cadillac Division had a less elaborate organization than the other Car Divisions, but it still maintained similar organizational control. Cadillac operated through independently-owned distributorships, which in turn appointed dealers. Each distributor, who was also a dealer, performed functions similar to the zone offices of the other divisions. In

5. There is no indication in the record of the financing arrangements of the other dealers.

6. The Oldsmobile and Buick zone offices serving the District were in Silver Spring, Maryland, also a part of the Washington Metropolitan Area.

1957 and 1958, there was one distributor in the District, who also had the only Cadillac dealership in the District. Two other dealers in the surrounding area were appointed by him. The distributor was the primary contact with Cadillac's central offices, analogous to the zone offices of the other divisions. Dealers' reports, similar to those submitted by dealers in the other divisions, were channeled through the distributor to the Detroit office. A district manager employed by Cadillac supervised and coordinated the efforts of the seven distributors (forty-nine dealers) in the District and nearby states. He maintained a residence in the District and usually prepared his reports here. His primary function was to help the distributors, and through them the dealers, perform more efficiently.

Besides the Car Divisions, General Motors had several other operating divisions. GMC Truck & Coach Division operated under an organizational system similar to that of the four Car Divisions. It promoted the sale of vehicles and parts and supervised the activities of its dealers, who operated under Dealer Selling Agreements. There was one GMC Truck dealer in the District. A division representative and a service representative personally approached bus company customers in the District to promote coach sales and advise on service problems.

The Government Sales Section, the Cleveland Diesel Engine Division, the Detroit Diesel Engine Division, and the Allison Division also had offices in the District for the purpose of selling their products to the United States Government and to maintain general liaison with the Government.[7] None of the car or truck divisions made Government sales.

The United Motors Service Division, responsible for wholesale distribution of certain parts and accessories for General Motors products, maintained a zone office in the District. Orders taken in the District were filled from plants outside the District. The division maintained written agreements with wholesalers, seventeen of which were in the District.[8]

The AC Spark Plug Division maintained offices in the District only for liaison with the federal government. Nongovernment sales were made by personnel headquartered outside the District. Sales in the District, made to wholesalers and national accounts, were made by a territory manager, whose duty was to promote sales through sales meetings with the seven warehouse distributors in the District, sales contests, and display and merchandising programs.

Several administrative offices were maintained in the District. GMAC and Motors Holding Division have been previously discussed. The Business Research Staff had the function of forecasting general economic conditions and their effect on the sale of company products. The General Motors Overseas Operations Division dealt with the United States and foreign governments and international agencies in respect of products sold abroad. The Patent Section conducted patent research and did some detail work regarding litigation. Its central Detroit office handled licensing and other business matters related to patents. The Public Relations Staff handled any necessary lobbying, relations with the press and other communications media, and general services to visiting executives.

On the basis of past decisions of this court,[9] it is clear that General Motors is engaged in "trade or business" within

7. So far as the record indicates, income from operations of these divisions is not involved in this case. D.C.Code § 47–1557a(b) (13) excludes from the definition of "net income"

"Income derived from the sale of tangible personal property to the United States by corporations * * * having their principal places of business located outside the District, which property is delivered from places outside the District for use outside the District * * *."

8. It was the income derived from the operations of this division which General Motors originally contended was the only income taxable by the District.

9. Lever Bros. Co. v. District of Columbia, 92 U.S.App.D.C. 147, 204 F.2d 39 (1953);

the District, as that term is defined in the District Code.[10] The company does far more than promote the sale of its products in the District for the benefit of what it calls "independent contractors." The provisions of the Dealer Selling Agreements constitute a continuing business relationship with its "authorized dealers," in which General Motors exercises a large degree of control over daily business operations. Additional control was exercised through the financial aid given by Motors Holding Division and GMAC. "[General Motors had] supervisory control over at least a substantial part of the business of the local [dealer] or representative or at least a part-time claim on the services of the individuals or organizations acting for it." [11]

For the same reasons that General Motors' operations subject it to taxation in the District, the provisions of Public Law 86–272, § 101,[12] do not remove it from the taxable jurisdiction of the District. That law, enacted in 1959, protects a business from taxation by a State if the only business activities within the State involve solicitation of orders for the business itself, or for its prospective customers. The law's proscription applies only in the case of these minimal business contacts. We think the facts already outlined are sufficient to show that the activities of General Motors surpass any mere solicitation of business.[13]

General Motors recognizes that neither the District Code nor P.L. 86–272 removes it from all taxation by the District. In its brief, it states that "[I]t will be noted that these protective statutes, construed and applied as we urge, although they forbid the assessments made in this case, do not exempt [the company] from paying to the District a franchise tax based on net income." The controversy we face, therefore, is not one as to the District's jurisdiction to tax General Motors at all, nor as to the number of dollars arising from the so-called District sales. Our problem is as to the propriety of the formula used to identify, in General Motors total net income, that portion which may be reasonably thought to flow from the District activities and sales.

## III

The first issue we confront is whether the District Code permits use of the single-factor sales formula. The question is not a new one in this court, although this is the first time the whole court has had occasion to consider it.[14]

*cf.* Fiat Motor Co. v. Alabama Imported Cars, Inc., 110 U.S.App.D.C. 252, 292 F. 2d 745, cert. denied, 368 U.S. 898, 82 S. Ct. 175, 7 L.Ed.2d 94 (1961).

10. D.C.Code § 47–1551c(h).

11. Lever Bros. Co. v. District of Columbia, 92 U.S.App.D.C. at 149, 204 F.2d at 41.

12. 73 Stat. 555, 15 U.S.C. §§ 381–84. The law was passed in response to the Supreme Court's decision in Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959). See Hirshberg & Nedry, *A Federal Concept of Doing Business*, 46 Va.L.Rev. 1241 (1960); Roland, *Public Law 86–272: Regulation or Raid*, 46 Va.L.Rev. 1172 (1960). For present purposes, we assume that the law applies to the District and to the taxable years involved.

13. The act also protects a business which sells only through "independent contractors," which are defined as persons selling or soliciting sales "for more than one principal." General Motors' dealers are not in that category.

14. The formula was specifically upheld as valid under the statute in Smoot Sand & Gravel Corp. v. District of Columbia, 104 U.S.App.D.C. 292, 261 F.2d 758, cert. denied, 359 U.S. 968, 79 S.Ct. 876, 3 L.Ed. 2d 834 (1958), over the taxpayer's objection that its net income should have been "apportioned by a formula which takes into account its property values and operating costs, as well as sales; [and] that the regulation is invalid because it directs the apportionment of net income by considering only sales * * *." In *Smoot*, we were in agreement with the Tax Court. However, three years later, in the first *Gallant* case, *supra*, the Tax Court ruled the single-factor formula invalid as not authorized by the statute. We reversed the Tax Court on that point, citing *Smoot*. In the instant case, the Tax Court again held the single-factor formula invalid, noting that in *Smoot* "[T]he U.S. Court of Appeals evidently overlooked the mandate

The statute, set forth above,[15] clearly does not require use of any particular formula. Nor can we discover a Congressional purpose or intent that a particular formula be utilized. The statute expressly delegates to the Commissioners the power to adopt any formula that will effectuate the taxing scheme devised by Congress. Thus, however much we might applaud a specific formula as a matter of wise fiscal and economic policy, we are not at liberty to substitute it for that adopted by the Commissioners. The most that we could do is to reject the Commissioners' approach as unauthorized.

The statute, in §§ 47–1580 and 47–1580a, contemplates three mutually exclusive sources of corporate net income taxable by the District. The first source, "allocated" to the District, is the income from a trade or business which is "carried on or engaged in wholly within the District." In such a situation, the gross income and expenses arise in the District, and the District is entitled to tax the entire net income from the business. The second source, also "allocated" to the District, is "other income * * * derived from sources within the District." Again the gross income and expenses arise in the District, and the District may tax the entire net income.[16] The third source, and the one in controversy here, is income from a trade or business conducted both within and without the District. The income from this source must be "apportioned," and only that portion attributable to the trade or business conducted in the District is taxable. The Commissioners' formula for making the required apportionment is as follows: Net income arising from activities within the District (and thus taxable) is to total net income of the corporation as sales made within the District is to total sales made by the corporation.[17]

It is this formula for apportionment that General Motors challenges and the Tax Court held unauthorized under the statute. It is contended that the sales formula adopted is in conflict with the taxing scheme and allots to the District a greater portion of the income of unitary interstate businesses than was intended. This contention is based upon a theoretically possible reading of certain key words of the statute. That reading is at least implicitly in conflict with prior interpretations by this court.[18]

The crucial language is: "If the trade or business of any corporation * * * is carried on or engaged in both within

of the statute as to apportioning the income within and without the District. * * *" It is evident, however, from the reported decision in *Smoot* that the panel deciding that case, with full awareness of this and other provisions of the statute, held that the District Code does not preclude the use of a single-factor sales formula.

15. See footnotes 1 and 2, *supra.*

16. The District argues here that, regardless of whether General Motors' income from District sales is taxable under the provision applicable to corporations conducting a trade or business in the district, it is taxable as "other income * * * derived from sources within the District." Since the Tax Court held that the income from District sales was taxable under the "trade or business" provision and General Motors did not appeal that finding, and since we find the income to be fully taxable under the "trade or business" provision, we need not at this time pass on the scope of the "other income" provision. However, it should be noted that this court has interpreted that provision to cover income arising from transactions outside the scope of a regular "trade or business" carried on within the District, such as rents, royalties, and income from the sale of real property. District of Columbia v. Evening Star Newspaper Co., 106 U.S.App.D.C. 360, 273 F.2d 95 (1959); see Lever Bros. Co. v. District of Columbia, supra. The interpretation called for by the District would result in an overlap of the two provisions not called for by the taxing scheme.

17. Regulations Pertaining to Income & Franchise Taxes, promulgated on August 6, 1953, § 10.2(c) (1) (a), set forth in footnote 3 *supra.*

18. See cases cited in footnote 14, *supra.* See also Eastman Kodak Co. v. District of Columbia, 76 U.S.App.D.C. 339, 131 F.2d 347 (1942). (considering the same question under the gross receipts tax in effect before 1947).

and without the District, *the net income derived therefrom shall* * * * be deemed to be income from sources within and without the District." [Emphasis added.] D.C.Code § 47–1580a. General Motors and the Tax Court would interpret the words italicized to refer to net income *arising from activities in the District*. In this case, those activities principally involve sales. They then argue that the net income so earned must be "deemed to be income from sources within and without the District." Thus, the apportionment called for must be an apportionment of only this income. A permissible formula, under this interpretation, would first require a determination of the net income on the sales made in the District. Apparently the sales-income ratio would be appropriate for this purpose. But this is only the first step. The net income so determined would then be "apportioned" under a formula which would assign a part of the net income to each step in the manufacture-distribution process. This would recognize the fact that each step "earns" part of that income. The District would only be permitted to tax that part of the net income "earned" by the steps in the process which occur in the District, in this case principally the final sales step.[19] The District would not be permitted to tax that income economically attributable to the processing stages before sale, since they occur outside the District. This would call for some cost accounting formula that would divine the exact amount of income generated by each element of the manufacturing and distributing process through which a particular product passes on its way from raw materials to ultimate sale. They argue that the three-factor formula, while not a precise cost accounting method of separating and applying the net income from a sale to the various stages, is a rough equivalent and is therefore authorized by the statute, but that the single-factor sales formula is not authorized since it does not even attempt such an application.[20]

The District, on the other hand, argues, and we think correctly, that the net income to be apportioned is the net income from the entire business of the corporation rather than that income arising solely from District sales. To read the statute as General Motors requests, the word "therefrom" must refer only to net income arising from that part of a trade or business carried on *within* the District. But it seems clear to us, from a simple reading of the words used, that "therefrom" refers to the income earned internally *and* externally by a corporation that carries on a trade or business both within and without the District, that is to say, its total income. Only by putting in language which does not appear can "net income" be restricted to that arising only from District sales. Read as we read it, the statute clearly permits, although it does not require, the single-factor sales formula adopted by the Commissioners.

The General Motors interpretation is obviously a complex and sophisticated one. We believe it more probable that the District's approach reflects the intent of Congress. A court should not apply a taxing statute more narrowly than its clear language imports unless there is some showing of Congressional

19. They concede that the income "earned" on activities in the District other than sales would also be taxable under this scheme.

20. Whether anything short of a precise cost accounting system, which would fairly apply the net income to the various processes, would satisfy General Motors' reading of the statute is a serious but moot question. It is not at all clear that the three-factor formula is even a close approximation of the kind of economic breakdown called for. While there is some relationship between the cost of payroll and property attributable to a certain stage and the income arising from that stage, it is not at all certain what that relationship is. Moreover, the sales process, being the end product of all the other stages and responsible for the actual receipt of the *money* income, could be said to be the most important stage, thus permitting a greater proportionate share of the income to be assigned to it vis-a-vis the other steps in the process.

intent that it should do so. The revenue act of which the franchise tax is a part was passed in 1947 to raise desperately needed revenues for the District. It was subjected to extensive study by a joint committee of Congress;[21] it was debated at length in the House and to a lesser extent in the Senate,[22] and several reports were written concerning it.[23] Nowhere in this material is there any indication that the crucial language in this section was intended to be read as General Motors suggests. This seems particularly important since, as we pointed out in the *Smoot* case, the prior gross receipts tax has been interpreted by this court to permit a single-factor sales formula similar to that presently used by the District.[24] It would seem that any intended change in application would have been indicated clearly by Congress.

Thus, we must find that the apportionment required relates to the entire net income of the corporation. We hold that the single-factor sales formula is permitted by the statute and, unless it is unconstitutional, the Tax Court must be reversed.

█ As noted above, the Tax Court invalidated the single-factor formula in this instance solely by reference to the statute and not to the Constitution. It expressly disclaimed the latter as a ground of decision because of the uncertainties it entertained as to its own status, i. e., court or administrative agency. We see no need to pursue this problem at this time, but we do think it appropriate to note that the record in this case was made up of evidence taken by the Tax Court, and its findings of fact are to be treated with the respect customarily accorded to the trier by a reviewing body.

One of those findings might well be thought to be conclusive upon us, absent any demonstration by us of a lack of foundation for it in the record. This is the last of the findings, No. 6, which is as follows:

> "The method used by the assessing authority of the District attributed to the District 100 per centum of the net income derived by the petitioner from that segment of its business which consisted of the manufacture without, and sale of the products within the District. The percentage thus determined was out of all reasonable proportion to the trade or business carried on or engaged in by petitioner within the District."

It seems evident that the first sentence of this finding is the premise for the second, which, latter, standing alone and undisturbed, would take the taxpayer here beyond the reach of the taxing statute. The premise in this instance, although stated in factual terms, appears to us to reflect the faulty reading of the statute which we have discussed at length immediately hereinabove. In other words, the premise assumes that the net income

21. See *Hearings Before the Joint Subcommittee on Fiscal Affairs of the Committee on the District of Columbia on Methods of Acquiring Additional Revenue Through Taxes and Other Means*, 80th Cong., 1st Sess. (1947).

22. See, *e. g.*, 95 Cong.Rec. 6629 (1947) (House); 95 Cong.Rec. 7357 (1947) (Senate).

23. House Comm. on the District of Columbia, *Tax Legislation for the District of Columbia, Re: H.R. 3737*, Committee Print, 80th Cong., 1st Sess. (1947); S. Rep. No. 280, 80th Cong., 1st Sess. (1947); H.R.Rep. No. 543, 80th Cong., 1st Sess. (1947); H.R.Rep. No. 699, 80th Cong., 1st Sess. (1947); H.R.Rep. No. 801, 80th Cong., 1st Sess. (1947).

24. See Panitz v. District of Columbia, 74 App.D.C. 284, 122 F.2d 61 (1941); Eastman Kodak Co. v. District of Columbia, *supra*. Moreover, the regulations promulgated in 1947, immediately after the Act was passed, included the same sales formula now in use. Regulations Pertaining to Income and Franchise Taxes, promulgated August 28, 1947, § 10-2(d) (1). The Commissioners participated actively in the drafting of the Act and it would seem that they would have been aware of any intended change. This is not to say that, since they participated in the drafting, anything they do reflects the intent of Congress. However, if a change was intended, it would seem that the District officials would have at some point in the legislative process spoken out on the matter.

to be apportioned is only that derived from transactions which touch upon the District of Columbia, as distinct from the total net income of General Motors from its operations at large, including those physically related to the District of Columbia.

To the extent, therefore, that No. 6 is a true finding of fact, it rests upon an erroneous view of the applicable law; and, therefore, we do no violence to sound principles of appellate review when we conclude that this finding does not dictate our decision. We need not demonstrate that the particular fact found is untrue if it is irrelevant.

IV

Our inquiry, however, is not finished with the determination that the District Code permits the tax formula in use. We turn to the claim that the single-factor sales formula violates the due process clause by unreasonably apportioning income which properly has no relation to business done in the District, and the commerce clause by imposing an excessive burden of taxation.

That a single-factor formula is not inherently arbitrary or unreasonable is too well-settled to be subject to doubt at this late date.[25] Nor is this controverted by the holdings in other cases that multi-factor formulas are also constitutional.[26] The question remains, however, whether as to this taxpayer the tax is arbitrary and unreasonable. The burden of showing this is on the taxpayer; and the burden is a heavy one. "One who attacks a formula of apportionment carries a distinct burden of showing by 'clear and cogent evidence' that it results in extra-territorial values being taxed." Butler Bros. v. McColgan, 315 U.S. at 507, 62 S.Ct. at 704, 86 L.Ed. 991. General Motors concedes that it was subject to taxation by the District. The company has not sustained its burden of showing that the tax levied on it, as determined by the single-factor sales formula, was "not reasonably attributable"[27] to the business transacted in the District so as to result in the taxation of extraterritorial values.

The evidence offered by General Motors in the Tax Court showed that only a small percentage of its property and payroll was located in the District. On the basis of testimony given by the economist-witnesses that, from an economic standpoint, income must be spread across the entire manufacturing process which precedes the ultimate sale in order to reflect the points where that income was actually "earned," the Tax Court found that a three-factor formula must be utilized to reflect accurately the income taxable in the District. With this finding, General Motors now contends that it has met the burden of showing the tax "not reasonably attributable" to its business conducted in the District. We disagree. An analysis of Supreme Court decisions illustrates that proof that a tax is not in reasonable proportion to business conducted must be much more detailed and specific than that adduced here.

In Underwood Typewriter Co. v. Chamberlain, *supra*, the Supreme Court held that the taxpayers had not sustained their burdens of showing that the taxes involved were arbitrary and unreasonable. The State of Connecticut imposed a tax on net income based on a single-factor property formula, which resulted in a tax on forty-seven per cent of Underwood's income. Underwood relied upon

25. Smoot Sand & Gravel Corp. v. District of Columbia, supra; Eastman Kodak Co. v. District of Columbia, *supra*; Panitz v. District of Columbia, *supra;* Ford Motor Co. v. Beauchamp, 308 U.S. 331, 60 S.Ct. 273, 84 L.Ed. 304 (1939); Bass, Ratcliff & Gretton, Ltd. v. State Tax Comm'n, 266 U.S. 271, 45 S.Ct. 82, 69 L. Ed. 282 (1924); Underwood Typewriter Co. v. Chamberlain, 254 U.S. 113, 41 S. Ct. 45, 65 L.Ed. 165 (1920).

26. Northwestern States Portland Cement Co. v. Minnesota, *supra*; International Harvester Co. v. Evatt, 329 U.S. 416, 67 S.Ct. 444, 91 L.Ed. 390 (1947); Butler Bros. v. McColgan, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942); United States Glue Co. v. Town of Oak Creek, 247 U.S. 321, 38 S.Ct. 499, 62 L.Ed. 1135 (1918).

27. Hans Rees' Sons, Inc. v. North Carolina, 283 U.S. 123, 133, 51 S.Ct. 385, 75 L. Ed. 879 (1931).

a showing that most of its receipts were from sales made outside the State:

"But this showing wholly fails to sustain the objection. The profits of the corporation were largely earned by a series of transactions beginning with manufacture in Connecticut and ending with sale in other states. In this it was typical of a large part of the manufacturing business conducted in the state. The Legislature, in attempting to put upon this business its fair share of the burden of taxation, was faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders. It therefore, adopted a method of apportionment which, for all that appears in this record, reached, and was meant to reach, only the profits earned within the state." [28]

It should be noted that in this quotation the Supreme Court accepted the economic theory here advanced by General Motors, namely, that "[T]he profits were largely earned by a series of transactions beginning with manufacture * * * and ending with sales. * * *" The theory proved the case in *Underwood* no better than it does here.

The case most strongly relied on by General Motors in its constitutional argument does not closely resemble the one before us. In *Haus Rees' Sons, Inc. v. North Carolina, supra,* the Supreme Court held that a North Carolina income tax based upon a single-factor property formula was arbitrary and unreasonable as applied to the taxpayer, who was engaged in the manufacture and sale of leather goods. In this case the Supreme Court was confronted with this characterization of the evidence by the North Carolina Supreme Court:

"Without burdening this opinion with detailed compilations set out in the record, the evidence offered by the petitioner tends to show that, for the years 1923, 1924, 1925, and 1926, the average income having its source in the manufacturing and tanning operations within the state of North Carolina was 17 per cent." (quoted at p. 127 of 283 U.S., at p. 387 of 51 S.Ct., 75 L.Ed. 879).

At the same time, the evidence showed that, for the same year, the percentage of the taxpayer's total net income apportioned to North Carolina by the formula in question averaged eighty percent. Accepting these facts as found by the state court, and setting the resulting sets of figures against each other, the Supreme Court stated:

"* * * [I]n any aspect of the evidence, * * * the statutory method, as applied to the appellant's business for the years in question operated unreasonably and arbitrarily, in attributing to North Carolina a percentage of income out of all appropriate proportion to the business transacted by the appellant in that state. In this view, the taxes as laid were beyond the state's authority." [29]

28. 254 U.S. at 120–121, 41 S.Ct. at 47, 65 L.Ed. 165. The burden which *Underwood* failed to carry was " 'showing that 47 per cent. of its net income [was] not reasonably attributable, for purposes of taxation, to the manufacture of products from the sale of which 80 per cent. of its gross earnings was derived after paying manufacturing costs.' " *Ibid.*

The taxpayer in Bass, Ratcliff & Gretton, Ltd. v. State Tax Comm'n., *supra,* engaged in brewing (done wholly in England) and selling ale, some of which was sold in New York through branch offices, also failed to meet its burden of showing that the New York franchise tax was unreasonable as applied to it.

"* * * [A]s the Company carried on the unitary business of manufacturing and selling ale, in which its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York and other places—the process of manufacturing resulting in no profits until it ends in sales—the State was justified in attributing to New York a just proportion of the profits earned by the Company from such unitary business." 266 U.S. at 282, 45 S.Ct. at 84, 69 L.Ed. 282.

29. 283 U.S. at 135–136, 51 S.Ct. at 389, 75 L.Ed. 879.

Unlike the proof adduced in *Hans Rees' Sons,* the evidence here did not undertake to show that the District of Columbia operations accounted for an identified percentage of General Motors total net income, which percentage could, as in *Hans Rees' Sons,* be compared with that taxed under the single-factor formula. The testimony offered by General Motors was largely that of economists who described the unitary character of the manufacturing and selling operations as respects the generation of profits, and who urged the three-factor formula as the one most likely to attribute a fair share of these profits to the District activities. Economic experts offered by the District dissented from this latter view, and insisted that the one-factor sales formula was a reasonable choice among alternative methods. Nowhere in the record do there appear specific percentages of the kind accepted by the Supreme Court in *Hans Rees' Sons.* That case, therefore, does not compel the decision in this; and, indeed, the evidence in the present record leaves us in the position in which the Supreme Court found itself in *Underwood Typewriter* and *Bass.*

"[T]he economic wisdom of state net income taxes is one of state policy not for our decision * * *."[30] Indeed, there is no unity of agreement even among economists as to the factors which should be used or the weight each should be given in a reasonably accurate formula for state taxation of multi-state business.[31] Quite obviously, this court has no sound basis for ruling that one formula rather than another must be followed as the only legally permissible one, in the absence of a tangible demonstration, as in *Hans Rees' Sons,* that the formula under attack is operating indefensibly. The demonstration itself conceivably might take different forms, but each must reveal some concrete circumstance by which arbitrariness and irrationality, in the constitutional degree, may be identified.

V

The second constitutional attack by General Motors on the District's formula is based on an asserted violation of the commerce clause. A state-imposed income tax on a corporation which operates in interstate commerce does not violate the commerce clause merely because of that fact. The tax may be invalid if the corporation engaged "exclusively" in interstate commerce, with no local intrastate business. Spector Motor Service, Inc. v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951). Or it may be invalid if it discriminates against interstate commerce "either by providing a direct commercial advantage to local business, Memphis Steam Laundry [Cleaner] v. Stone, 342 U.S. 389 [72 S.Ct. 424, 96 L.Ed. 436] (1952) * * * [*cf.* Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963)], or by subjecting interstate commerce to the burden of 'multiple taxation,' Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157 [74 S.Ct. 396, 98 L.Ed. 583] (1954) * * *."[32] However, a tax which is fairly apportioned to local activities, and is non-discriminatory, is a valid exercise of the State's taxing powers. "While it is true that a State may not erect a wall around its borders preventing commerce an entry, it is axiomatic that the founders did not intend to immunize such commerce from carrying its fair share of the costs of the state government in return for the benefits it derives from within the State." Northwestern States Portland Cement Co. v.

30. Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. at 462, 79 S. Ct. at 364, 3 L.Ed.2d 421.

31. See Barber, *State Taxation of Net Income Derived from Interstate Commerce,* 48 A.B.A.J. 1133 (1962), and Britton, *State Taxation of Extraterritorial Value: Allocation of Sales to Destination,* 46 Va.L.Rev. 1160 (1960), both of whom criticize the inclusion of a sales factor in an apportionment formula. For a short history of the varying proposals by tax experts for more perfect apportionment, see Ratliff, Interstate Apportionment of Business Income for State Income Tax Purposes, pp. 17–28 (1962).

32. Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. at 458, 79 S.Ct. at 362, 3 L.Ed.2d 421.

Minnesota, 358 U.S. at 461–462, 79 S.Ct. at 364, 3 L.Ed.2d 421.

General Motors bases its commerce clause argument only on the ground that the District's single-factor formula discriminates against interstate commerce by resulting in unconstitutional double taxation of its income. It is undisputed that, as found by the Tax Court, the vehicles sold to customers in the District were manufactured largely in Michigan, Maryland, and Delaware. In the taxable years in question, General Motors paid these States a tax based on its net income, apportioned by each State on the basis of a three-factor formula of property, payroll, and sales, equally weighted.[33] This, of course, is the formula advocated in this case by the company.

As with the due process contention, the burden is on General Motors to show by specific evidence that "double taxation" would result from the application of the District's formula. This it has failed to do. The company has produced only a hypothetical situation to prove its case: "Assume that Chevrolet has a net income of $3,000,000 derived from the manufacture and sale of automobiles sold to customers located in the District; that three-fourths of the manufacturing activity takes place in Michigan and one-fourth (including the activities of the zone or 'sales' office) takes place in Maryland. Michigan would tax 50% of the income (one-third of 75% property, 75% payroll, 0% of sales); Maryland would tax 16⅔% (one-third of 25% property, 25% payroll, 0% sales); and the District would tax 100% (sales alone). Chevrolet is taxed by the three states combined on 166⅔% of its total income."

Aside from the economic arguments that the income from these sales were attributable to operations in jurisdictions outside the District, no showing was made that the relatively minor portions of sales were not reasonably attributable to the concededly relatively minor scope of operations in the District. This court recognized in Broadcasting Publications, Inc. v. District of Columbia that exactitude is not possible in apportionment formulas:

> "In allocating Taxpayer's income for franchise tax purposes, neither the statute nor the Regulations attempt to determine what precise percentage of the income is attributable to each separate facet of the publication process and then allocate it geographically. That is unrealistic if not impossible." [34]

Secondly, and perhaps more importantly, the uniformity produced by the use of similar factors is more apparent than real. General Motors has pointed to only one facet of the apportionment process by which the tax structures of Michigan, Maryland, and Delaware, are similar to each other, and dissimilar to the District's structure. That facet consists of the factors which each uses to apportion business income to the respective states. However, the methods used to arrive at the portion of each factor which is attributable to the particular state are at least as important as the factors themselves in determining whether or not tax structures are similar. Similarity may or may not exist in the definition of local sales, the accounting procedures used, and the deductions permitted from gross income in order to arrive at net income.[35] In short, General Motors has not shown

33. The taxes paid were:

| *Year* | *State* | *Amount* |
|---|---|---|
| 1957 | Michigan | $8,955,799.55 |
| 1958 | Michigan | 6,940,309.50 |
| 1957 | Maryland | 510,792.31 |
| 1958 | Maryland | 271,425.75 |
| 1958 | Delaware | 127,844.95 |

34. 114 U.S.App.D.C. 163, 168, 313 F.2d 554, 559 (1962), See also Underwood Typewriter Co. v. Chamberlain, 254 U.S. at 121, 41 S.Ct. at 47, 65 L.Ed. 165, where the Supreme Court referred to "the impossibility of allocating specifically the profits earned by the processes conducted" within the borders of the taxing state.

35. See Studenski, *The Need for Federal Curbs on State Taxes on Interstate Commerce: An Economist's Viewpoint,*

that the District's single-factor sales formula would impose a burden of double taxation.

"Logically it is impossible, when the tax is fairly apportioned, to have the same income taxed twice. In practical operation, however, apportionment formulas being what they are, the possibility of the contrary is not foreclosed * * *. There is nothing to show that multiple taxation is present. We cannot deal in abstractions. In this type of case the taxpayers must show that the formula places a burden upon interstate commerce in a constitutional sense. This they have failed to do." [36]

VI

Nothing that we have said should be taken to mean that the single-factor sales formula is the *only* permissible formula which the District Commissioners might adopt under the authority committed to them by Congress in the taxing statute. Our holding is only that neither the District Code nor the Constitution *prevents* the use of the present formula of apportionment. On March 22, 1961, the Finance Officer of the District recommended to the Commissioners that they adopt the same three-factor formula which General Motors here advocates. The District's Director of General Administration added his recommendation that the formula be approved. Adoption of the new formula would bring the District into line with the apportionment formulae now used by twenty-five of the thirty-seven States and the District of Columbia which levy taxes on or measured by net income.[37] The Finance Officer stated that the formula has been endorsed for use by all of the States on a uniform basis by a number of expert and informed groups. We have no reason to doubt the authority of the Commissioners to adopt a property-payroll-sales formula. What we said in *Smoot* is equally applicable to our holding in this case: "The value and situs of the corporation's property used in its operation could doubtless have been ruled to be a permissible factor in apportioning income * * * but to say that this would be permissible does not demonstrate that it must be considered an indispensable factor." [38]

However, the judicial branch has neither the mandate nor the machinery to make the policy determinations implicit in the choice of an apportionment formula. This is a legislative responsibility which has been reposed by Congress in the District Commissioners, and its wise discharge necessitates the use of legislative methods of inquiry into, and resolution of, issues affecting the interests of the District, of which maximum tax revenue is but one. This court can deal only

46 Va.L.Rev. 1121 (1960); Barber, *supra* note 31, at 1135. Ratliff, *op. cit. supra* note 31, at 29–31, states:

"Uniformity does not exist to the degree, however, that the [similarity of factors used] may suggest, for the factors are defined variously by the states. For example, among the locations to which sales are assigned are the locations of the following: office where negotiated, property at time of order, receipt or acceptance of order, negotiating personnel, point of delivery, and origin of shipment. Among the bases for allocating payrolls are: office location, time spent in the state, and compensation earned in the state.

Generally the states provide for the direct allocation of certain types of income, such as capital gains, rents, royalties, dividends, and interest. However, 6 of the * * * [states imposing a net income tax] make no provision for the direct allocation of any income. Usually states allowed separate accounting in cases where the taxpayer shows that it more clearly reflects the income attributable to the state than does the formula, but again there are 6 that do not allow it."

36. Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. at 462–463, 79 S.Ct. at 364, 3 L.Ed.2d 421.

37. These figures are found in Ratliff, *supra* note 31, at 29–30. Not included in the author's computation, but added here, is the State of Michigan, which also employs a three-factor formula.

38. Smoot Sand & Gravel Corp. v. District of Columbia, 104 U.S.App.D.C. at 298–299, 261 F.2d at 764–765.

with the individual case as it arises, and once it is determined that a legislatively adopted formula is not prohibited by statute or the Constitution, our task is complete. As Mr. Justice Frankfurter has stated:

"The complexity of the proposals of the [Civil Aeronautics] Board's Report—the items to be taken into account, the balance to be struck among them, the problem of giving the States their due without unfairly burdening an industry of vital national import—indicates how ill-adapted the judicial process is, as against the choices open to Congress, for dealing with these problems and how warily this Court should move within the limits of its own inescapable duty to act. The protection of interstate commerce against the burden of multiple taxation ought not to be left to litigation growing out of changes in the methods of taxation.

" 'The immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment. Courts are not possessed of instruments of determination so delicate as to enable them to weigh the various factors in a complicated economic setting which, as to an isolated application of a State tax, might mitigate the obvious burden generally created by a direct tax on commerce.' Freeman v. Hewit, 329 U.S. 249, 256 [67 S.Ct. 274, 278, 91 L.Ed. 265]." [39]

Having found that the single-factor sales formula employed by the District is permitted by the District Code, and not shown on this record to be violative of the Constitution, we hold that the franchise tax levied against the General Motors Corporation for the years 1957 and 1958 was a valid one. The decisions of the District of Columbia Tax Court are accordingly,

Reversed

DANAHER, Circuit Judge (dissenting):

This court in Smoot Sand and Gravel Corp. v. District of Columbia [1] was urged to consider a three-factor formula consisting of manufacturing costs, business property located in the District and sales made here. But the opinion noted that no evidence had been offered to compel acceptance of that formula. Moreover, the petitioner had failed to show that an arbitrary and unreasonable result flowed from the regulation which directed the apportionment of net income by considering only sales. Thus we refused to say that the assessments were invalid and erroneous.

Here the Tax Court, after noting that most of the facts and the evidence based upon exhibits had been stipulated, further found:

"5. The segment of petitioner's business which was conducted both within and without the District of Columbia consisted of the manufacture of a certain number of automobiles and kindred products without the District and the sale thereof to customers within the District. The net income from this segment of petitioner's business was earned by a series of transactions beginning with the manufacture of products in several states and ending with the sale to customers in the District. While the net income was not realized until sale, it was earned in part by manufacture of the products sold, including in addition to actual manufacture, procurement of material, financing, use of property and administration.

39. Braniff Airways, Inc. v. Nebraska State Bd. of Equalization & Assessment, 347 U.S. 590, 606, 74 S.Ct. 757, 766, 98 L.Ed. 967 (1954) (dissenting opinion).

1. 104 U.S.App.D.C. 292, 298, 261 F.2d 758, 764 (1958), cert. denied, 359 U.S. 968, 79 S.Ct. 876, 3 L.Ed.2d 834 (1959).

"6. The method used by the assessing authority of the District attributed to the District 100 per centum of the net income derived by the petitioner from that segment of its business which consisted of the manufacture without, and sale of the products within the District. The percentage thus determined was out of all reasonable proportion to the trade or business carried on or engaged in by petitioner within the District."

With *Smoot Sand and Gravel* before it, the Tax Court expressly found that the District's use of the single-factor sales formula had allocated to the District all of the petitioner's income, earned at all stages, although only certain final sales had occurred in the District. Thus the sales formula failed to apportion petitioner's income as the Code commanded where income from a sale within the District was actually earned "partly within and partly without" the District.

"If the trade or business of any corporation * * * is carried on or engaged in both within and without the District, the net income derived *therefrom* [that is, from *business* so carried on or engaged in both within and without the District] shall * * be deemed to be income from sources within and without the District." D.C.CODE § 47–1580a (1961). (Emphasis added.)

The same section next provides that where net income is so derived, the *portion* subject to tax shall be determined under regulations prescribed by the Commissioners. Clearly the purpose of the statute is to reach only a "proper"—*i. e.*, an equitable and just—"portion" which shall be subject to tax. To that end, the Code authorized the Assessor to employ "any formula or formulas" provided by regulation "which, *in his opinion, should* be applied in order to *properly* determine the net income * * * subject to tax." (Emphasis added.) The language speaks in terms of what is right and reasonable and just and equitable according to the facts. At least that much is required to save the tax from becoming an invalid imposition. The Assessor is not empowered broadly to utilize "any formula," but only one which "should" be utilized that the amount of tax be "properly" determined. And we have so held:

"It seems clear from the statutory provisions considered as a whole that the Assessor is vested with discretion to select the most appropriate formula from among those set out in the regulations. Where no appropriate formula appears in the regulations, we think he has authority to devise one which in his judgment will properly determine the net income subject to tax and the correct amount of the tax. His determination is of course subject to review in the courts." District of Columbia v. Gallant Incorporated, 110 U.S.App. D.C. 202, 204–205, 290 F.2d 745, 747–748, (1961).

Even if the Assessor shall have failed so to act, the Tax Court itself can not be precluded for lack of a regulatory formula, from determining the income which is fairly apportionable to the District, we said. Accordingly, we remanded the case to the Tax Court, thus:

"The Tax Court is directed to determine the amount of the income which is fairly attributable to the District by applying the August 6, 1953, regulations, including if necessary the use of such formula or formulae as the Tax Court deems best suited for determination of that question in this case." 110 U.S.App.D.C. at 205, 290 F.2d at 748.

It does not do for the majority simply to say that as to *some* corporations and in *some* situations a single-factor formula may validly be utilized.[2] Nor is it an

2. See, *e. g.*, District of Columbia v. Gallant Incorporated, 113 U.S.App.D.C. 92, 305 F.2d 761 (1962). After our remand in the first *Gallant* case, text *supra*, the Tax Court found the sales formula best suited in the circumstances. We affirmed the result as just and reasonable even as we observed that the sales test is not the only

answer to *this* taxpayer's contentions that the records in *some* cases have shown no more than that the single-factor formula has not resulted inequitably. We are here dealing with a record which overwhelmingly sustains the Tax Court's findings. I deem its conclusion inescapable that the single-factor sales formula utilized by the Assessor was here proved to be arbitrary and inequitable in its result, and therefore not consistent with the requirement of the Code. Having reached that conclusion, the Tax Court did precisely what we said should be done to determine an *equitable* tax. Agreeably to the *Gallant* directive, *supra,* the Tax Court applied "such formula or formulae as the Tax Court deems best suited for determination of [the petitioner's net income] in this case."

Consistently with what we had said was its duty to use the formula best suited to the determination required by the Code, the Tax Court turned to the three-factor formula substantially as set forth in the Uniform Division of Income for Tax Purposes Act.[3] The Tax Court's decision noted that the parties had stipulated facts sufficient for the application of that formula. A study of the findings not only bears out that conclusion, but in my view, necessarily impels a rejection of the single-factor sales formula *as here applied.* I would affirm the Tax Court's decision.[4]

WILBUR K. MILLER and BASTIAN, Circuit Judges, concur in the foregoing dissenting opinion.

BURGER, Circuit Judge (concurring in part and dissenting in part):

I agree with the majority that the Tax Court is probably without power to construct a three-factor formula to be substituted for the one-factor formula used by the Assessor. That the Tax Court's formula makes sense and the Assessor's does not is not the issue; rather it is a matter of where the power resides. I join with the dissent in viewing the Assessor's action as arbitrary and I would go further and hold that it is legally arbitrary and capricious, and hence violative of the statute under which the District purported to act. I would remand to require a reassessment of the tax, precluding the use of the one-factor formula. Concluding that the Assessor's action was violative of the statute, I need not now reach the issue whether it was also violative of any constitutional protections.

On Petition for Modification of Judgment

PER CURIAM:

In the prior opinion of this court in these cases, it was stated at page 889 that:

> "General Motors paid the assessment under protest, and appealed to the Tax Court. In that court, two primary arguments were urged as to the invalidity of the assessed deficiencies: one, that the numerator of the sales formula was too broad, in that it included sales which were not 'District sales'; and, two, that use of the single-factor apportion-

or necessarily the best test. Other factors may be equally or even more relevant, we noted.

3. Approved 1957, by the National Conference of Commissioners on Uniform State Laws and by the American Bar Association; and see *State Taxation of Net Income Derived from Interstate Commerce,* 48 A.B.A.J. 1133 (December 1962).

4. The Finance Officer on March 22, 1961 recommended that the Commissioners adopt the three-factor formula as "the most accurate and equitable method yet devised for apportioning among the States the taxable net income of corporations operating in a number of States." The Commissioners on March 28, 1961 approved the proposed amendments to the regulations with such amendments as might appear necessary after public hearing, all to become effective as of January 1, 1962. With this case impending, final action seems to have been postponed.

ment formula itself was permitted neither by the District Code nor by the Constitution."

On page 889 this court stated that:
"For purposes of this appeal, [General Motors] appears to concede the correctness of the figures found by the Tax Court as representing 'District sales.' The controversy before us, therefore, does not relate to the definition of what sales by General Motors properly may be taken to be 'District sales,' made in the course of a business activity which is carried on both within and without the District. It relates, rather, to the formula to be used for apportioning to the District that part of General Motors entire net income attributable to its 'District sales.'"

General Motors has petitioned for a modification of this Court's judgment to the limited extent of remanding the cases to the Tax Court for consideration of the application of the regulation embodying the single-factor formula to the facts. It is said that, since the Tax Court found that regulation invalid and proceeded to apply one of its own, there was never any adjudication of the contentions made by the taxpayer as to the proper scope of the application of the former to its D. C. operations. There having been no ruling on these contentions, adverse or otherwise, there was, of course, nothing to be made the subject of an appeal, or to be waived, by the taxpayer.

We find this request to be meritorious and, indeed, consistent with the above-quoted passages from our prior opinion. We are also satisfied from an examination of the record that this issue was not stipulated away by General Motors. General Motors is, it seems to us, entitled to press, and to have resolved, its contentions with respect to the proper determination of "District sales" for purposes of a one-factor formula regulation which we, unlike the Tax Court, have found to be valid.

The petition is, accordingly, granted; and our earlier judgment is modified to the extent of providing that the reversal of the Tax Court decisions is to be accompanied by remand to the Tax Court for such further proceedings as are not inconsistent herewith.

It is so ordered.

WILBUR K. MILLER, DANAHER and BASTIAN, Circuit Judges (dissenting).

Even as modified the majority opinion remains unacceptable to us. We adhere to the position more fully stated in our original dissent.